RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0330P (6th Cir.)
File Name: 03a0330p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

THOMAS CLYDE BOWLING,
JR.,
    *Petitioner-Appellant,*

    *v.*

PHILLIP PARKER, Warden,
    *Respondent-Appellee.*

No. 01-5832

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 99-00236—Karl S. Forester, Chief District Judge.

Argued: December 10, 2002

Decided and Filed: September 17, 2003

Before: MOORE, GILMAN, and GIBBONS, Circuit
Judges.

———————

#### COUNSEL

**ARGUED:** Elizabeth R. Stovall, COMMONWEALTH OF
KENTUCKY, DEPARTMENT OF PUBLIC ADVOCACY,
LaGrange, Kentucky, for Appellant. Ian G. Sonego, OFFICE
OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for

Appellee. **ON BRIEF:** Elizabeth R. Stovall,
COMMONWEALTH OF KENTUCKY, DEPARTMENT OF
PUBLIC ADVOCACY, LaGrange, Kentucky, Susan J.
Balliet, DEPARTMENT OF PUBLIC ADVOCACY,
Frankfort, Kentucky, for Appellant. Ian G. Sonego, OFFICE
OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for
Appellee.

———————

#### OPINION

———————

KAREN NELSON MOORE, Circuit Judge. Thomas Clyde
Bowling, Jr. ("Bowling") appeals the district court's
judgment denying both his petition for a writ of habeas corpus
and his request for an evidentiary hearing in conjunction with
that petition. Bowling was convicted in state court of
murdering Tina and Eddie Earley and sentenced to death. His
conviction and death sentence were affirmed by Kentucky
courts on direct appeal and in post-conviction proceedings.
In the district court and now on appeal, Bowling raises
numerous claims of error. He contends that he was denied
proper jury instructions, given ineffective assistance of
counsel, deprived of an evidentiary hearing, denied a fair jury,
subjected to numerous instances of prosecutorial misconduct,
and given a sentence that was constitutionally
disproportionate. For the reasons that follow, we **AFFIRM**
the decision of the district court below, and deny Bowling's
petition for a writ of habeas corpus and his request for an
evidentiary hearing.

### I. BACKGROUND

#### A. Factual Background

Early in the morning on April 9, 1990, Eddie and Tina
Earley were shot to death in their automobile in a parking lot
outside a Lexington dry-cleaning establishment. Their two-

year-old son Christopher was also shot, but not fatally. Police arriving at the scene found several witnesses offering varied observations of the shooter, collected several bullets from inside and outside the vehicle, and recovered debris consistent with a car collision. After analyzing the debris, the police determined that the Earleys' car must have been hit by a 1981 light blue Chevrolet Malibu. They also determined that a 1981 Malibu was registered in the county to Bowling. The police, however, did not seek to arrest Bowling at that point; instead they pursued several theories of who could have murdered the Earleys.

On the following day, April 10, 1990, police received a telephone call from Bowling's sister, Patricia Gentry. Gentry and her mother, Iva Lee Bowling, were worried because they had not seen Bowling, who was affectionately known as T.C., since approximately 6:00 a.m. the preceding day. Watching the news reports, they realized that Bowling's car matched the description of the suspected killer's car. Searching for Bowling, the two women drove to property owned by the family in rural Powell County. There they discovered Bowling's car. Bowling, however, was not there. When they returned to Gentry's Knoxville home, they discovered Bowling asleep on the couch. After consulting with their minister, they called the police, who came and picked Bowling up without incident. The police then recovered Bowling's car from the Powell County property, where they also discovered a buried .357-magnum revolver.

Bowling was represented at trial by three attorneys: Baldani, Summers, and Richardson. Prior to trial, these attorneys had Bowling undergo a neurological and psychological evaluation by Dr. Donald Beal.

## B. The Trial

On December 10, 1990, the trial began. The court's stated goal in voir dire was to qualify forty-four of the ninety-nine pooled jurors. Qualifying forty-four jurors would allow the

defendant to have eighteen peremptory challenges and the government twelve, with twelve people remaining to be jurors and two to be alternates. Later, however, the court stated that it was worried that the jury pool would be too small, so it ended up qualifying forty-eight jurors, but then struck the four extra jurors.

On December 12, the guilt phase of the trial began. The Commonwealth produced twenty-five witnesses. There were three eye-witnesses to the crime. The first, Larry Turner, never saw the shooter; he went to the crime scene after hearing what he thought was a car backfiring. By the time he reached the car, the killer had already fled, and Turner observed only the Earleys' dented car, the dead bodies, and the child crying. David Boyd testified that while stopped at a stoplight, he looked back to see two cars in the parking lot and a man firing a gun into one of them. According to Boyd, the shooter then stood and looked at the scene before driving off. Boyd described the car as being a light blue 1979 or 1980 Malibu and described the shooter as being six feet tall with a medium build, wearing a black jacket and a brimmed hat. The third eyewitness, Norman Pullins, who had seen the events from a nursing home across the street, could not be found by either party. By agreement of the parties, the police played their audiotape of an interview with Pullins that took place the morning of the shootings. The police next testified regarding the crime scene and presented to the jury photographs and a videotape depicting the scene in considerable detail.

The Commonwealth then focused on the evidence discovered at the Bowling property in Powell County. One officer testified that he found Bowling's Malibu in the thicket, and an orange jacket, an orange Little Caesar's T-shirt from Bowling's workplace, and a black Rangers' hat in a small shed. The officer also found an unused outhouse on the property into which several empty alcohol bottles had been thrown. Another officer testified to finding the gun on the property. Lastly, an officer testified that he retrieved

Bowling's personal effects from his sister's house, including a black jacket.

The state then introduced expert testimony. A forensic pathologist testified that the Earleys had no chance of surviving the injuries that they sustained. A police automotive expert testified that the glass, plastic, and chrome debris from the crime scene matched Bowling's car. Another expert testified that paint from the Earleys' car had rubbed off (because of the accident) onto Bowling's car, and that paint from Bowling's car had also rubbed off on the Earleys' car. The expert unambiguously stated that tests on the paint samples demonstrated that it was Bowling's car that had rammed into the Earleys' vehicle. A state ballistics expert identified the recovered gun as a Smith and Wesson .357 and stated that the bullets shot from it would have identical markings to those recovered from the crime scene. On cross-examination, however, he admitted that there may be millions of guns that would have left marks like those on the bullets found at the crime scene.

The Commonwealth also presented testimony from Clay Brackett that he had sold a similar-looking Smith and Wesson .357 to Bowling a few days before the killings. There were also two witnesses, Jack Mullins and Jack Strange, who placed Bowling on the road in front of the property in Powell County the evening of the murders.

The Commonwealth then called Bowling's family to testify to the events leading up to the telephone call that they made to the police. Bowling's family testified that Bowling had been seriously depressed in the weeks before the shootings. Bowling was also obsessed with death. During a drive with his mother a few days before the shooting, Bowling told her that his time had run out and that she should look for him at the family property in Powell County if he disappeared. During this drive, Bowling had stopped for approximately thirty minutes in a parking lot, behind the nursing home property across from the dry-cleaning place where the Earleys

worked. Bowling had also shown to his family the gun that he had recently purchased from Brackett.

The defense presented no witnesses, choosing not to present the expert testimony of Dr. Beal. Bowling's counsel asked for time to inform Bowling again of his right to testify, but after consulting with Bowling, counsel announced that Bowling would not testify.[1] The defense rested on their cross-examinations of the witnesses. The defense had brought out Bowling's erratic behavior during the weekend before the shootings. Brackett admitted, while he was being cross-examined, that he traded in handguns without keeping records and had poor memory and hearing. David Boyd admitted that he may have told a police detective that the shooter had long brown hair, a dark complexion, and possibly a mustache — none of which describe Bowling. Though defense counsel did not gain much ground from the expert witnesses, the Commonwealth's ballistics expert did concede that the .357-magnum was one of perhaps millions of guns that could have fired the bullets that killed the Earleys. Defense counsel also established that none of Bowling's possessions, including his car, had any blood on them, that there were no fingerprints found on the gun or at the crime scene, and that the only lead residue on Bowling's belongings was inside the left pocket of his jacket and could have come from a gun or from bullets.

The defense asked for jury instructions on extreme emotional disturbance, circumstantial evidence, and reckless homicide. The trial court denied these instructions. The jury found Bowling guilty of intentionally murdering Tina and Eddie Earley and assaulting their son Christopher.

---

[1] In an interview with a mental health worker held while Bowling was in jail, Bowling claimed that he "had no recollection of the day of the crime." J.A. at 54 (Pet. Br. in Dist. Ct.).

Before the penalty phase began, Bowling, his defense counsel, and the prosecution met because Bowling had filed a pro se motion to discharge his attorneys. Bowling stated that he was angry with his attorneys because they had essentially presented no defense on his behalf. Bowling claimed that he did not have ample opportunity to meet with his attorneys; Bowling told the state court judge that his attorneys had not spent more than a total of one hour with him throughout the litigation. Bowling said that there were many witnesses who could have been called to testify — although, when questioned, he could not give the names of any such witnesses or list any particular act that his attorneys failed to do. Bowling stressed, however, that he had no time to tell his attorneys of witnesses who might have been called, because his attorneys had not met with him. Bowling said that he felt that his attorneys did not take his case seriously, and that they once remarked to another person in front of Bowling that they did not have a defense. The district court denied his motion to discharge his attorneys.

The penalty phase then began. The defense called six witnesses to testify. There were three non-family members: a former co-worker of Bowling and two jail employees, all of whom spoke kindly of Bowling. The defense also called Bowling's mother, his sister, and his son, who discussed their love for Bowling, his mental and emotional deterioration in the weeks before the killings, his failed marriage, and his having only a ninth-grade education and being of low mental ability. Bowling did not testify.

The trial court denied Bowling's request for specific mitigating instructions on extreme emotional disturbance, mental illness, intoxication, and model jail conduct, but gave a general mitigating instruction. The trial court also instructed the jurors on one statutory aggravating factor, that of intentionally causing multiple deaths. The jury found that the aggravating factor applied and recommended two death sentences. The trial judge sentenced Bowling to death.

## C. Post-Trial Case History

Bowling's conviction and sentences underwent mandatory review by the Kentucky Supreme Court pursuant to Kentucky Revised Code § 532.075. The Kentucky Supreme Court affirmed his conviction and sentence on September 30, 1993. *Bowling v. Commonwealth*, 873 S.W.2d 175 (Ky. 1993) ["*Bowling I*"]. Two justices dissented. The dissenting justices argued that Bowling should have been given an instruction on extreme emotional disturbance in the guilt and penalty phases, *id.* at 182-85 (Leibson, J., dissenting), and one justice also would have reversed the conviction because of prosecutorial misconduct, *id.* at 185-87 (Burke, S.J., dissenting).

Bowling then began his post-conviction proceedings in a state circuit court. Here, however, Bowling made a potentially significant procedural error. On February 28, 1995, he filed a notice of intent to file a motion for post-conviction relief under Kentucky Rule of Criminal Procedure (known as "RCr") 11.42. However, he did not file the motion itself at that time. Governor Patton set Bowling's execution date for February 1, 1996. Eventually, the Supreme Court of Kentucky determined that Bowling's execution could not be stayed without the actual motion being filed. *Bowling v. Commonwealth*, 926 S.W.2d 667, 669 (Ky. 1996). So on January 26, 1996, Bowling's counsel filed a rushed but formal RCr 11.42 motion, and asked for more time to file an amended or supplemental motion. On February 8, 1996, the state circuit court granted the request, and gave Bowling 120 additional days running from the initial deadline, January 26, 1996. On May 28, 1996, a supplemental RCr motion was filed, but it was not verified as required by Kentucky law. On June 6, 1996, clearly after the 120-day period, Bowling filed the revised version as a verified supplemental motion. On October 1, 1996, the circuit court ordered both versions of the supplemental motion stricken, the first for being unverified and the second for being untimely, which ostensibly prevented those claims from being addressed. The state

circuit court recognized its power to allow amendment for equitable reasons but declined to exercise that power. The circuit court found against Bowling on the merits on all the remaining claims.

The Kentucky Supreme Court unanimously affirmed the circuit court's decision. *Bowling v. Commonwealth*, 981 S.W.2d 545 (Ky. 1998) ["*Bowling II*"]. The Kentucky Supreme Court dismissed the claims Bowling raised in his initial RCr petition as not having merit. The Kentucky Supreme Court then addressed the claims raised in Bowling's struck supplemental motions. The Kentucky Supreme Court prefaced its analysis of Bowling's claims with the following statement:

> Appellant presents a number of other issues in his supplemental RCr 11.42 motion. Notwithstanding that his supplemental motion was struck by the trial court, in the interest of judicial economy we will review the seven additional claims of ineffective assistance of counsel raised in the motion.

*Id.* at 551. The Kentucky Supreme Court then denied Bowling's claims on the merits.

Bowling filed a motion for a writ of habeas corpus with the district court on August 12, 1999. Bowling moved for an evidentiary hearing with the district court on some issues, but this motion was denied. Ultimately, the district court denied the writ. *Bowling v. Parker*, 138 F. Supp. 2d 821 (E.D. Ky. 2001) ["*Bowling III*"]. The district court granted a certificate of appealability as to all issues.

## II. ANALYSIS

### A. The Legal Standards of AEDPA

This court reviews de novo the legal conclusions of a district court denying habeas relief. *Palazzolo v. Gorcyca*,

244 F.3d 512, 515 (6th Cir.), *cert. denied*, 534 U.S. 828 (2001). As Bowling's habeas petition was filed on August 12, 1999, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to AEDPA, relief is available with respect to claims adjudicated on the merits in state court only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Moreover, the findings of a state court are presumed to be correct and can only be contravened if Bowling can show by clear and convincing evidence that they are erroneous. *See* 28 U.S.C. § 2254(e)(1). The presumption of correctness also attaches to the factual findings of a state appellate court based on the state trial record. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).

### B. Procedural Default

Before addressing the merits of Bowling's appeal, we must address the state's contention that some of Bowling's claims are procedurally defaulted. The government argues that because Bowling's supplemental RCr motions were struck by the trial court, the claims that appear only therein are defaulted and cannot be revived in a federal habeas corpus action.

We reject the state's contention that these claims have been procedurally defaulted. It is clear that if a petitioner defaults his federal claims in state court by failing to comply with an adequate and independent state procedural rule, federal

habeas relief is barred unless the petitioner can show cause for the default and actual prejudice, or a resultant fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). This court recently spoke to how courts are to examine an allegation of procedural default:

> First, the court must determine whether there is such a procedural rule that is applicable to the claim at issue and whether the petitioner did, in fact, fail to follow it. Second, the court must decide whether the state courts actually enforced its procedural sanction. Third, the court must decide whether the state's procedural forfeiture is an "adequate and independent" ground on which the state can rely to foreclose review of a federal constitutional claim. . . . And, fourth, the petitioner must demonstrate . . . that there was "cause" for him to neglect the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Greer v. Mitchell*, 264 F.3d 663, 673 (6th Cir. 2001) (citations omitted) (citing, *inter alia*, *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)), *cert. denied*, 535 U.S. 940 (2002). At issue here is the second prong of the *Maupin* test; Bowling questions whether the Kentucky Supreme Court actually enforced its procedural sanction. In this regard, the Supreme Court has stated that "[t]he mere existence of a basis for a state procedural bar does not deprive [federal courts] of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985); *see also Coleman*, 501 U.S. at 735 (requiring that the last state court rendering a reasoned judgment on the matter "clearly and expressly" state that its judgment rests on such a procedural bar for the doctrine of procedural default to apply).

The language used by the Kentucky Supreme Court in its opinion reveals that it did not clearly rely on Bowling's procedural default to dismiss the claims raised in his

supplemental motion. After noting that the claims were raised only in the struck supplemental pleadings, the Kentucky Supreme Court went on to consider the merits of those claims, stating, "Notwithstanding that his supplemental motion was struck by the trial court, in the interest of judicial economy we will review the seven additional claims of ineffective assistance of counsel raised in the motion." *Bowling II*, 981 S.W.2d at 551.

There are two reasonable interpretations to which this statement is susceptible. The Kentucky Supreme Court may have been relying on the procedural default. Its dismissal of Bowling's claims on the merits would then be considered an alternative holding. In such a situation, we would consider the claims in the struck motion procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (stating that "a state court need not fear reaching the merits of a federal claim in an *alternative* holding"); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998). However, the Kentucky Supreme Court may have well been using the word "notwithstanding" to ignore the issue of possible procedural default and consider the claims on the merits. In such a case, Bowling's claims would not be defaulted because the state court would not have been relying on the procedural bar in its disposition of the case.

We find both interpretations eminently plausible. The use of the word "notwithstanding" could suggest either that the Kentucky Supreme Court was enforcing the procedural default or that it was waiving it. Moreover, the possibility that the Kentucky Supreme Court was in fact waiving the default is amplified by the fact that it went on to consider Bowling's claims on the merits. *See Harris*, 489 U.S. at 266 n.13 (noting that "[w]hile it perhaps could be argued that this statement would have sufficed had the state court never reached the federal claim," the fact that "the state court clearly went on to reject the federal claim on the merits" makes it less clear that the state court actually relied on the procedural bar). Ultimately, the fact that both interpretations are sensible settles this issue in Bowling's favor, for there

must be unambiguous state-court reliance on a procedural default for it to block our review. *See Gall v. Parker*, 231 F.3d 265, 321 (6th Cir. 2000), *cert. denied*, 533 U.S. 941 (2001).

We therefore proceed to the merits of Bowling's claims. His contentions of error fall into six general categories. He claims that he was denied proper jury instructions, his counsel was constitutionally ineffective, he was improperly denied an evidentiary hearing, the jury in his case was constitutionally invalid, the prosecutors acted inappropriately towards him at trial, and his death sentence was constitutionally disproportionate.

## C.  Denial of Proper Jury Instructions

Bowling's first claim for relief is his claim that he was denied proper jury instructions in both the guilt and penalty phases of his trial. Although Bowling's claim that he was entitled in the guilt phase to a jury instruction on extreme emotional disturbance ("EED") is the strongest claim he brings in his habeas petition, we find it ultimately unpersuasive. We therefore dismiss Bowling's claim that he was denied proper jury instructions.

### 1.  Instructions in the Guilt Phase

Bowling claims that the trial court improperly failed to give the jury a lesser-included-offense instruction in the guilt phase. Bowling contends that the jury should have been given an instruction on extreme emotional disturbance; if the jury then had found extreme emotional disturbance, it would have convicted Bowling only of manslaughter (rather than murder). *See* KY. REV. CODE ANN. § 507.030(b) (defining manslaughter as an intentional killing "under circumstances which do not constitute murder because [the defendant] acts under the influence of extreme emotional disturbance").

The Supreme Court has held that the failure to give a lesser-included-offense instruction can violate due process. *See Beck v. Alabama*, 447 U.S. 625 (1980). In *Beck*, the defendant and his accomplice broke into the house of an eighty-year-old man and tied him up. According to Beck, the accomplice struck the man and killed him. Beck consistently maintained that he did not kill the victim and that he had never intended for the murder to occur. The state charged him with "robbery-intentional killing," a capital crime. *Id.* at 628. Pursuant to the applicable state statute, the trial judge was prohibited from instructing the jury on the lesser-included offense of "felony-murder," a non-capital crime. The jury convicted Beck of intentional murder, and he was sentenced to death. The Supreme Court held that it is a denial of due process for a jury to be deprived of the opportunity to consider the lesser-included offense of felony-murder when "the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction." *Id.* at 638.

In this case, manslaughter is a lesser-included offense of murder under Kentucky law. *See Bray v. Commonwealth*, 68 S.W.3d 375, 383 (Ky. 2002) (analyzing whether a defendant should have received an instruction on the "lesser included offense of first degree manslaughter" where he was convicted of murder, but claimed that he was extremely emotionally disturbed at the time of the homicide); *see also* KY. REV. CODE ANN. § 507.030(b) (defining manslaughter as a lesser-included offense of murder).

Nonetheless, while due process can require an instruction on lesser offenses that are necessarily included in the greater offense, due process does not require an instruction on a lesser-included offense if the evidence does not support such an instruction. *Hopper v. Evans*, 456 U.S. 605, 611 (1982). Instead, "a *Beck* instruction is only required when 'there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense,' but not the greater." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (quoting *Hopper*, 456 U.S. at 610), *cert. denied*, 535 U.S. 975

(2002). This constitutional requirement is virtually identical to the Kentucky requirement that an instruction be given when "'a juror might entertain reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond reasonable doubt that the defendant is guilty of the lesser offense.'" *Jacobs v. Commonwealth*, 58 S.W.3d 435, 446 (Ky. 2001) (citation omitted). The Kentucky Supreme Court determined that the evidence at trial would not permit a rational jury to find extreme emotional disturbance. *See Bowling I*, 873 S.W.2d at 179 (discussing this claim). Given the deference that we are required to give to the Kentucky Supreme Court's analysis of this question, we ask only whether the Kentucky Supreme Court was unreasonable in its conclusion that the evidence at trial would not permit a rational jury to find extreme emotional disturbance. *See Campbell*, 260 F.3d at 543 (noting that the question is "whether the state court's application of [the *Beck*] rule to these facts was objectively unreasonable").

To answer this question, however, we must discern the meaning of the term, "extreme emotional disturbance." This is a question of state law. *See Bennett v. Scroggy*, 793 F.2d 772, 778 (6th Cir. 1986) ("A due process clause claim that one is entitled to instructions on a lesser included offense can be resolved only by determining what the elements of those offenses are. Hence, the reviewing court must look first to the state's law."). Kentucky law, at the time of *Bowling*'s case, had explained EED as follows:

Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the

viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986). Kentucky courts have explained that, to show EED, there must be a triggering event — a "sudden and uninterrupted" event that "triggers the explosion of violence on the part of the criminal defendant." *Foster v. Commonwealth*, 827 S.W.2d 670, 678 (Ky. 1991) (holding that a woman was not entitled to an EED instruction after she murdered five individuals without a recent aggravating incident, despite the fact that the woman had suffered significant physical and emotional harm as a child and abused drugs and alcohol). As a result, "extreme emotional disturbance is not established by evidence of insanity or mental illness, but require [sic] a showing of some dramatic event which creates a temporary emotional disturbance as opposed to a more generalized mental derangement." *Stanford v. Commonwealth*, 793 S.W.2d 112, 115 (Ky. 1990).

Bowling claims that, under the facts of his case and the definition of EED used above, an EED instruction was required. It is undisputed that Bowling's car crashed into the Earleys' car in the Earley Bird Cleaners' parking lot and that the front right-hand side of Bowling's car impacted the driver's side of the Earleys' car. Bowling argues that this accident was a triggering event that enraged Bowling, overthrew his judgment, and caused him to get out of his car and kill the Earleys. This theory, Bowling argues, would explain the otherwise motiveless killing of the Earleys and would also explain why Bowling did not simply get out of his car and shoot the Earleys rather than damaging his own car first.[2]

---

[2] We note parenthetically that this argument was adopted by two justices of the Kentucky Supreme Court on Bowling's direct appeal. *Bowling I*, 873 S.W.2d at 182-85 (Leibson, J., dissenting).

Bowling acknowledges that he has submitted no evidence supporting his argument that an EED instruction was necessary.[3]  He argues merely that we should infer from the very fact that a car accident preceded the shootings that the car accident must have triggered an uncontrollable rage that caused the shootings.

The facts of this case do not support such an inference. Bowling's accident involved a parked car in a parking lot far away from the street.  It resulted in no physical injury to Bowling and only minor damage to both cars.  Bowling's car remained drivable.  In fact, his car only suffered light damage to its front right-hand side; according to expert testimony and photographic evidence, only the right front fender and its parking light assembly were damaged.  As Bowling's car was

---

[3]Under current Kentucky law, Bowling has the burden of proving EED; the government is not charged with proving its absence.  *See Wellman v. Commonwealth*, 694 S.W.2d 696, 697 (Ky. 1985).  Bowling argues in his brief that the government should have had the burden of proving an absence of EED at trial.  Bowling cites a recent Sixth Circuit case that granted habeas relief on such grounds.  *See Gall v Parker*, 231 F.3d 265, 288-91 (6th Cir. 2000) (holding that the Kentucky Supreme Court erroneously put the burden on the defendant to show EED when it was actually the government's obligation to prove a lack of EED), *cert. denied*, 533 U.S. 941 (2001).  The salient difference between this case and *Gall*, however, is that the trial and appeal in *Gall* took place in 1980 while the facts of this case occurred in 1991.  In the intervening period — in 1985, more specifically — the Kentucky Supreme Court explicitly shifted the burden of proof on this issue to the defendant.  *See Wellman*, 694 S.W.2d at 697 (overruling "those portions of [several cases] which declare that the *absence* of extreme emotional distress is an essential element of the crime of murder and require the Commonwealth to prove such absence").  As a result, under *Wellman*, it was proper for the trial court to put the burden of proving EED on Bowling.

Bowling argues that the *Wellman* decision violated due process and separation-of-powers principles by retroactively enlarging the scope of a criminal statute.  We, however, did not find the retroactivity argument persuasive even in Wellman's own habeas petition, *Wellman v. Rees*, No. 86-5988, 1987 WL 38211 (6th Cir. June 1, 1987), *cert. denied*, 484 U.S. 968 (1987), and we do not find it persuasive now.  We therefore dismiss this contention of error.

only impacted in the front right-hand side, it is clear that Bowling would have been able to see the impending collision. This suggests that Bowling either intentionally caused the accident or at least had knowledge that a collision was impending before it happened.

These facts make Bowling's claim of EED grossly implausible.  Bowling has introduced no evidence, such as that of a accident-reconstruction specialist, to support his claim.  He simply asks us to infer that the accident so enraged him as to overcome his judgment and cause him to act uncontrollably from the accident's impelling force.  Even if this were the case, however, the extreme emotional disturbance inquiry is not merely a subjective one.  It is also, in part, an objective one.  Therefore, even if Bowling were to show that he was emotionally enraged within the meaning of Kentucky law, Bowling would still not be able to show a "reasonable explanation or excuse" for his rage.  *McClellan*, 715 S.W.2d at 469.  We must agree with the Kentucky Supreme Court that this type of minor car accident in itself does not create a reasonable explanation or excuse for a double homicide.

Context also suggests that it was not the accident that caused the shootings.  Testimony at trial established that Bowling was seriously depressed and under the influence of alcohol in the days preceding the shooting.  Bowling was obsessed with death, made frequent morbid statements like "my time has run out," and told his mother, if he disappeared, to look for him on family property in Powell County.  J.A. at 4558 (Testimony of Iva Lee Bowling).  Bowling's state of mind might also be reflected in the fact that he purchased a gun a few days before the shootings and carried it with him the morning of the shootings.  Bowling suggests that these comments and actions support his claim that he was extremely emotionally disturbed at the time of the shootings. In reality, however, these comments and actions undercut his claim — for in order for Bowling to be entitled to an EED instruction, Kentucky law requires that the accident itself be

the "dramatic event which creates a temporary emotional disturbance as opposed to a more generalized mental derangement." *Stanford*, 793 S.W.2d at 115. All of Bowling's evidence suggests general mental illness, not a temporary and extreme emotional disturbance stemming from the accident. *See McClellan*, 715 S.W.2d at 468 (noting that "the condition must be a temporary disturbance of the emotions as opposed to mental derangement per se"). As a result, we cannot say that the Kentucky Supreme Court's decision that an EED instruction was not necessary was objectively unreasonable.[4]

## 2. Instructions in the Penalty Phase

Bowling's next claim is that he should have been granted a specific mitigating instruction on EED, mental illness, and intoxication in the penalty phase. Bowling complains that he was only given a general instruction on mitigation, which allowed the jury to consider any evidence they found mitigating, but did not specifically instruct them to take into account evidence of EED, mental illness, or intoxication. On appeal, the Kentucky Supreme Court upheld the general mitigating instruction, stating that Bowling was not constitutionally entitled to anything more. *Bowling I*, 873 S.W.2d at 180.

The Kentucky Supreme Court is correct. The United States Supreme Court rejected Bowling's claim in *Boyde v.*

---

[4]Bowling also makes a claim that the denial of an EED instruction in the guilt phase was improper under state law. Normally, habeas petitioners cannot obtain relief in federal court on the basis that the state courts did not follow state law; there generally must be some federal constitutional error. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002) ("State-law trial errors will not warrant habeas relief unless the 'error rises to the level of depriving the defendant of fundamental fairness in the trial process.'") (citation omitted). To the extent that this violation of state law was so flagrant as to amount to a denial of due process, we have already considered the claim and rejected it in our *Beck* discussion above.

*California*, 494 U.S. 370 (1990), where the Court held that a catch-all instruction on mitigation was constitutionally sufficient unless the instructions as a whole created "a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id*. at 380; *see also Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). An examination of the actual jury instructions reveals that there was no realistic chance of confusion.

The jury instructions correctly explain that the defendant is presumed to be innocent of the aggravating circumstance, and that the aggravating circumstance must be proved by the prosecution beyond a reasonable doubt. For each crime, the instructions explain that the jury need not impose the death penalty simply because the aggravating circumstance is proved beyond a reasonable doubt. They explain that the death penalty can be imposed despite the existence of a mitigating circumstance, but only if the aggravating circumstances outweigh the mitigating ones. Most importantly, the jury instructions explicitly call upon the jury to consider the mitigating evidence generally:

> [Y]ou shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence including, *but not limited to*, such of the following as you may believe from the evidence; (a) that the Defendant has no significant history of prior criminal activity. *You shall consider any other facts and circumstances which you consider to be mitigating or extenuating even though they are not listed in this instruction.*

J.A. at 5106-07 (italics added). The instruction clearly allows, and in fact commands, the jurors to consider evidence that they find mitigating. There is no reason to assume that the jury did not consider the evidence of EED, mental illness, and intoxication as potential mitigating evidence. *Cf. Payton v. Woodford*, 299 F.3d 815, 818-19 (9th Cir. 2002) (granting

habeas relief under AEDPA to a defendant whose evidence of a post-crime conversion and good works was likely not considered by the jury because the catch-all provision of the instructions only allowed the jury to consider circumstances that "extenuate[d] the gravity of the crime"). The mere fact that the jury was not given a particularized instruction on EED or mental illness, as opposed to a more generalized one, is simply not a constitutional wrong.[5]

## D.  Ineffective Assistance of Counsel

Bowling's next set of claims for relief arises from his allegation that he was provided with ineffective counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Bowling alleges that his counsel was constitutionally defective in six principal ways. Specifically, he asserts that counsel failed (1) to investigate the victims' drug activities, which would have led them to another viable suspect, Donald Adams, (2) to consult with Bowling before and during trial, (3) to present evidence that would have justified an instruction on EED and mitigation evidence more generally, (4) to prepare adequately before trial because of a pending criminal indictment against one of Bowling's attorneys, (5) to contact

a potentially exculpatory witness, and (6) to impeach effectively the government witnesses.

In order to succeed on any of these claims of ineffective assistance of counsel, Bowling must show two things. First, he must show that his counsel's performance was constitutionally deficient, and second, he must show that he was prejudiced by his counsel's errors. *Id*. at 687.

In order to prove his counsel constitutionally deficient, Bowling must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687-88. Bowling must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quotations omitted). Having proved his counsel deficient, Bowling must then show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" in this context is a "probability sufficient to undermine confidence in the outcome." *Id.*[6]

### 1.  Failing to Investigate the Victims

Bowling's first claim of ineffective assistance, which was discussed extensively at oral argument though not given much attention in the parties' appellate briefs, is that his counsel did not properly investigate the Earleys' involvement with drugs. If his counsel had performed a proper investigation, Bowling argues, they would have discovered that Eddie Earley had informed Lexington police of the drug activities of Donald Adams and that Donald Adams was the one who presumably shot the Earleys.

---

[5]In addition to arguing that the denial of a specific instruction in the penalty phase violates federal law, Bowling also claims that this denial violated a state statute that requires judges to give particularized instructions on mitigating factors. *See* KY. REV. CODE. ANN. § 532.025(2) ("In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence."). Bowling argues that he did present sufficient evidence to merit a specific instruction on these facts under state law. Whether or not we would agree with him on this point, Bowling ignores the fact that this court generally does not review alleged violations of state law in federal habeas proceedings. *See Estelle*, 502 U.S. at 67-68. We merely hold here that the state trial court's determination that Bowling was not entitled to instructions on these factors is not so fundamentally unfair as to violate due process.

[6]We note at the outset that the Kentucky Supreme Court addressed and rejected all of Bowling's claims of ineffective assistance that we consider here. *Bowling II*, 981 S.W.2d at 549-52.

To support his claim, Bowling points to a memorandum written by his attorneys roughly six weeks before trial. This memorandum lists twenty-seven tasks that counsel said they needed to accomplish before trial. One of these, task number twenty one, is an interview with Larry Walsh, who was the chief of Lexington police at the time. The memorandum states that they should interview Walsh because he was "friends with the victims" and because Eddie Earley "provided information concerning Donald Adam['s] drug activity." J.A. at 1237. We note that task number twenty is counsel's statement that they should interview Donald Adams, who "supposedly had [an] affair with Tina, and sold dope to Eddie." J.A. at 1237.

Counsel never interviewed Walsh. Bowling claims that if Walsh had been interviewed, Bowling's counsel would have found that Donald Adams was the one who killed the Earleys, or, at the very least, Bowling's counsel would have been able to create reasonable doubt by arguing that Adams committed the murders.

We must note that Bowling's theory that Donald Adams was involved in the murders is farfetched. Though Bowling never really explains how Donald Adams could have been the murderer under the facts adduced in the case, he seems to intimate that Adams must have stolen Bowling's car, committed the murders, and then deposited Bowling's car on the Bowling family's property. Among the more obvious problems with Bowling's theory is the fact that Bowling does not explain why Adams would choose to frame Bowling for the murders, how Adams stole Bowling's car, how Adams knew where Bowling's family property in rural Powell County was located, and — most importantly — how Jack Mullins and Jack Strange could have both identified Bowling near the Powell County property if he had not been there.

The implausibility of Bowling's thesis that Donald Adams was in fact the killer makes it virtually impossible for Bowling to prove that his counsel was constitutionally

deficient for not investigating this theory. In light of the tenuous connection between Adams and the murder, counsel's decision not to investigate further does not seem unreasonable. In fact, the memorandum that Bowling uses to show that his attorneys were deficient seems to support the opposite conclusion. The memorandum reveals a methodically organized defense team, and the mere fact that Bowling's attorneys failed to accomplish all of the tasks they set out for themselves may be an indication of their early ambitiousness rather than their later negligence.

Moreover, Bowling has put forth no evidence of prejudice. Bowling has not shown that anything inculpatory about Adams would have come out of an interview with the police chief. Bowling suggests that his attorneys would have at least discovered that Eddie Earley had previously informed on Donald Adams and that Donald Adams may have slept with Tina Earley. Bowling's attorneys, however, already suspected this. Bowling has put forth no evidence going beyond these facts; Bowling has not shown that Donald Adams was in any way actually connected to the Earleys' murders. Bowling has therefore not shown that the Kentucky Supreme Court's decision denying relief on this claim was unreasonable. *Bowling II*, 981 S.W.2d at 550.

### 2. Failing to Consult with Bowling

As explained in Part I.B, *supra*, Bowling first claimed ineffective assistance in the trial itself. Between the guilt and penalty phases, Bowling sought to have his counsel removed because Bowling felt they were unprepared. Bowling claimed that he did not have ample chance to explain the facts of the case to his attorneys because he had "not spent an hour, total, with any of them from day one." J.A. at 4921 (Trial Tr.). The few times that they did talk, Bowling claims, he was interrupted and ignored. While Bowling's attorneys did not put on a single witness, Bowling claimed that there were numerous witnesses who could have been called.

The Kentucky Supreme Court quickly rejected this claim on direct appeal, stating that "[t]he trial judge determined that the trial strategy used by Bowling's counsel had a better chance of success than any of which the trial judge could think in light of the strong evidence of guilt presented by the prosecution." *Bowling I*, 873 S.W.2d at 180.

This claim of ineffective assistance of counsel fails. First, it is not clear that Bowling has shown constitutional deficiency. The Supreme Court has emphasized that the focus of the Sixth Amendment is not on "the accused's relationship with his lawyer," but on "the adversarial process." *Wheat v. United States*, 486 U.S. 153, 159 (1988) (quotation omitted); *see also Dick v. Scroggy*, 882 F.2d 192, 197 (6th Cir. 1989) (holding, in a non-capital case, that *Strickland* was not violated when the defendant's attorney did not interview the defendant until the night before trial, and then for only thirty to forty-five minutes). Yet, the one-hour total consultation time that Bowling cites is alarming, and courts have granted habeas relief under such conditions. *See, e.g.*, *Harris By and Through Ramseyer v. Wood*, 64 F.3d 1432, 1436, 1438-39 (9th Cir. 1995) (holding that *Strickland* was violated when the defendant's counsel, among many other deficiencies, met with his client in a capital case for less than two hours).

We are concerned, however, by the fact that Bowling has done nothing to substantiate this bare allegation. Bowling has not even submitted a personal affidavit verifying the one-hour total consultation figure. Bowling's trial counsel signed affidavits stating their general strategy and admitting that they never interviewed Chief Walsh of the Police Department. Though they easily could have done so, these affidavits never mention the one-hour total consultation figure. Instead of providing that sort of substantive evidence, Bowling simply raises this claim in his briefs, often making very limited claims like, "Lead counsel at trial *appears* to have visited Mr. Bowling for a mere hour, cumulative," without any supporting evidence. J.A. at 1843 (Motion for Post-

Conviction Relief) (italics added). Moreover, the one-hour figure seems implausible, given that Bowling's trial lawyers could not have found the witnesses who testified at the penalty phase (which included Bowling's coworkers and jail supervisors) or discovered the rest of their submitted evidence without Bowling's aid. It also seems strange, for example, that Bowling's lawyers would have Bowling attend a psychological examination with a psychologist for nine hours and meet with him for only one.

Even, however, if the one-hour total consultation figure is accurate and Bowling has made out deficiency, Bowling has not shown the prejudice that his *Strickland* argument requires. As noted by the federal district court, Bowling has not shown how additional time spent with counsel could have altered the outcome of his trial. Bowling claimed in the colloquy with the state trial judge that numerous witnesses could have been called, but Bowling never specifically named anyone and stated in front of the trial judge that he would not testify himself. Bowling has not even alleged factually how additional time with his counsel would have aided his case or helped counsel obtain names of people to testify on his behalf. Bowling cannot therefore show prejudice; the mere fact that counsel spent little time with him is not enough under *Strickland*, without evidence of prejudice or other defects. As a result, Bowling has not shown that the Kentucky Supreme Court's decision denying him relief on this ground is unreasonable.

### 3. Failing to Present EED and Other Mitigating Evidence

Bowling's next claim is that his counsel was ineffective in their efforts to present evidence of an EED defense in the guilt phase and to present general evidence of mitigation in the penalty phase. Bowling claims that his lawyers did not present evidence that could have garnered Bowling a mitigating instruction under KY. REV. CODE ANN. § 532.025(2)(b)(2) and (7), which allow for mitigation upon

a showing of "extreme mental or emotional disturbance" or a lack of capacity "to appreciate the criminality of his conduct [or to conform the conduct] to the requirements of law . . . as a result of mental illness or retardation or intoxication."

Bowling makes several arguments. He argues that his lawyers failed to understand the Kentucky requirements of EED. He argues that his lawyers hastily prepared their expert Dr. Beal and that they should have presented him in the penalty phase. Bowling alleges that his lawyers did not put on Dr. Beal because Beal did not return a phone call. Bowling also argues that counsel in the penalty phase should have submitted evidence that Bowling had a growth removed from his head at age seven, sustained serious head injuries, had a violent alcoholic father, and suffered a history of alcohol abuse and blackouts. The Kentucky Supreme Court rejected all of these assorted claims. *Bowling II*, 981 S.W.2d at 550.

Some of Bowling's claims clearly have no merit. Bowling claims that Beal's analysis was a hasty last-minute effort, but Beal spent nine hours with Bowling, interviewed several members of Bowling's family, examined medical and family records, and wrote a written report. Bowling argues that his lawyers did not understand the Kentucky requirements of EED, but Bowling has offered no evidence to support this claim, and our review of the transcript suggests otherwise.

Bowling's chief objection seems to be a challenge to his counsel's decision not to put Dr. Beal on the stand. Many sensible reasons could justify this decision. First, if Beal had testified to Bowling's mental deterioration before the crime, that might have implicitly suggested to the jury that Bowling was the murderer. The decision not to call Beal as a witness may have been a necessary consequence of Bowling's insistence on not abandoning his claim of innocence in the guilt phase. Bowling claims, however, that his attorneys were simply lazy, pointing to the following statement that his attorneys made in deciding to rest his case:

Assuming that we — I mean, we are going to rest. We were — I didn't mean to seem like we were stringing him along. I do want them to know that we were considering putting Dr. Veal [sic] on this afternoon. We needed to talk to him about some additional information that we had. He did not get back to us. On further reflection, we decided to rest.

J.A. at 4757. In isolation, this comment suggests that his attorneys may have chosen not to call Beal as a witness because they could not find him. Even if this is true, however, it was better for Bowling that his attorneys did not call Dr. Beal to testify, as it is clear that Beal's testimony was not going to help Bowling establish extreme emotional disturbance. Beal's report states:

There is no evidence that the mental disorders substantially impaired this man[']s behavior with respect to the alleged actions, such that he lacked substantial capacity to appreciate the criminality of his conduct, or that he was unable to conform his conduct to the requirements of the law. In my opinion Mr. Bowling was *legally sane* at the time of the offenses for which he is charged.

J.A. at 5320 (Beal Report). The report contains other damaging observations as well. In his psychological assessment of Bowling, Beal reported Bowling as having a tendency to be "angry, irritable, resentful" and "asocial," and said that his offenses could be expected to be "vicious and assaultative . . . senseless, poorly planned, and poorly executed." J.A. at 5328. Moreover, it is clear that Dr. Beal did not think Bowling was entitled to an EED instruction. One of Bowling's attorneys wrote a memorandum describing his conversation with Dr. Beal, during which Dr. Beal suggested that "Bowling was in a frame of enraged anger prior to the murders, and we discussed that *this did not appear to be a heat of passion kind of thing, but rather something that had been developing several days earlier*."

J.A. at 5335 (Att'y Memorandum) (italics added). This would be very damaging information, for as we noted, *supra* at Part II.C, in our discussion of extreme emotional disturbance, it would, in fact, destroy Bowling's request for an EED instruction under Kentucky law. *See McClellan*, 715 S.W.2d at 468.

Because Beal's testimony was not going to help Bowling, it was certainly reasonable (and perhaps ultimately better for Bowling) that Bowling's counsel chose to rely on the testimony of their favorable lay witnesses, Bowling's sister and mother, who testified to his deteriorating state of mind, as well as on the state's mental health expert, Dr. Smith, whose report seems more helpful to the defense than the one of Dr. Beal. *See Bowling II*, 981 S.W.2d at 550 (noting that the State's profile "aided Appellant in his case more than his own psychologist's profile"). Dr. Smith, in contrast to Dr. Beal, believed that it was "unlikely but not impossible that Mr. Bowling, as a result of mental disease or defect, lacked substantial ability to comprehend the criminality of his behavior or to conform his behavior to the requirements of law." J.A. at 5186-87 (Smith Report). Smith's report also states that Bowling "suffers from Alcohol Abuse" and that at the time of the accident Bowling either "suffered from a major psychiatric disorder or . . . was suffering an ordinary reaction to the loss of his wife occurring in an alcoholic individual with this [Antisocial and Borderline] personality disorder." J.A. at 5186.

Since Beal's testimony was not going to aid Bowling, Bowling cannot show ineffective assistance of counsel for the failure to present it. Even if Bowling is right and his attorneys were not making a tactical error but were being deficient in failing to present Beal, Bowling cannot show prejudice.

Finally, Bowling argues that his counsel could and should have submitted evidence that Bowling had a growth removed from his head at age seven, serious head injuries, a violent

alcoholic father, and a history of alcohol abuse and blackouts. As an initial matter, Bowling did present some of this information. His sister and mother testified to his drinking, the prevalence of mental illness in the family, and his strange behavior during the weeks before the shooting. Bowling has not submitted evidence that he suffered from a violent alcoholic father. Bowling's evidence that he had a growth removed from his head and a serious head injury comes from an initial doctor's report noting the head growth and the fact that Bowling was in a boating accident as a child that left him unconscious. Beal's report, however, considered this earlier report, and did not think the head growth and childhood injury worthy of mention.

This evidence, though not presented, does not seem to have much importance. Bowling's counsel submitted these facts to their expert, who seemed to view them as trivial and not worth pursing. It was therefore reasonable for counsel to make the strategic decision to pursue other avenues of relief for Bowling by stressing his drinking, mood swings, and increasing depression. Moreover, Bowling cannot show any prejudice from this alleged deficiency, because it is simply unrealistic to say that knowledge of these two minor childhood incidents, which have no apparent connection to the present, could have changed anything. Bowling has not shown deficiency or prejudice as those terms have been used in other binding precedent. *Cf. Terry Williams v. Taylor*, 529 U.S. 362, 395-98 (2000) (finding ineffective assistance when counsel failed to introduce evidence that the defendant was borderline mentally retarded and was severely and repeatedly beaten by his father); *Coleman v. Mitchell*, 268 F.3d 417, 450-53 (6th Cir. 2001) (finding ineffective assistance when counsel failed to report that the defendant was borderline mentally retarded and sexually abused by his grandmother who involved him in her voodoo and group sex practices), *cert. denied*, 535 U.S. 1031 (2002); *Carter v. Bell*, 218 F.3d 581, 593-94, 600 (6th Cir. 2000) (finding ineffective assistance when counsel failed to introduce medical records showing multiple childhood and adult head injuries from

accidents and fights, and physician recommendations for psychiatric hospitalization); *Glenn v. Tate*, 71 F.3d 1204, 1208, 1211 (6th Cir. 1995) (finding ineffective assistance when counsel failed to introduce evidence showing that the defendant sustained organic brain damage before he was born and was mentally retarded as a result), *cert. denied*, 519 U.S. 910 (1996).

### 4.  Failing to Prepare Because of the Indictment

Bowling next claims that his attorney Summers was unprepared because Summers was told on the first day of trial that he was being indicted. Bowling points to an affidavit filed by another of his trial attorneys, Baldani, who stated that Summers was "extremely upset" and asked Baldani to cross-examine the investigating officer, Detective Henderson. J.A. at 1243 (Baldani Aff.).

In Bowling's post-conviction appeal, the Kentucky Supreme Court analyzed this claim and stated that "[w]ith no evidence that counsel's indictment had any negative implications on Appellant's trial, we cannot conclude that Appellant was denied effective counsel in this respect." *Bowling II*, 981 S.W.2d at 550.

The Kentucky Supreme Court is correct. Bowling has not even alleged that the performance of his defense team was hampered when Baldani had to take over for Summers. Neither Baldani in his affidavit nor Bowling in his brief makes any claim that Summers would have done a better job than Baldani did. On direct examination, Detective Henderson related the events surrounding Bowling's arrest in Knoxville, told of retrieving Bowling's personal effects, and testified about interviewing the witnesses placing Bowling on the road near where his car was discovered on the evening of the murder. On cross-examination, Baldani got Henderson to admit that none of the personal effects had blood on them and that the car itself did not have blood on it either. No part of Baldani's cross-examination seems substandard and Bowling

has not even suggested anything that Baldani failed to ask. This claim therefore fails.

### 5.  Failing to Investigate the Message With the Police

Bowling also argues that a message left within the police department long before the trial took place suggests that there may be another witness to the crime. The message is from an officer who had a friend whose boyfriend was a witness to the accident. The message reports only that the "incident occured [sic] over a fender bender type accident." J.A. at 1779.

Bowling contends that his counsel was ineffective for not taking steps to investigate who sent the message. Even assuming that Bowling could show his counsel was deficient for failing to do so, Bowling cannot prove prejudice. Bowling argues that if his counsel had been able to find this witness, then the witness could have rebutted the prosecution's theory that Bowling had intentionally rammed the car, which would have entitled Bowling to an instruction on EED. Bowling, however, has no evidence that the witness would testify that the incident was accidental or that an accidental collision would have been sufficient to warrant an instruction on EED. In fact, it seems likely that the witness would have hurt Bowling's case. The only thing known about the witness is that she described the accident preceding the shootings as a fender bender. This tends to suggest that the accident was an extremely minor one, which would contradict Bowling's claim that the accident was so jarring as to make him lose control over his actions and shoot the Earleys. Moreover, as the Kentucky Supreme Court stressed, "[i]t was not the lack of evidence pertaining to the collision, but rather the lack of evidence showing the effect the collision had upon Appellant that precluded the EED instruction." *Bowling II*, 981 S.W.2d at 549. As a result, this claim of error also fails.

### 6.  Failing to Impeach the Prosecution's Witnesses

Bowling's last claim of ineffective assistance of counsel is that his counsel inadequately cross-examined Clay Brackett.[7] Bowling argues that an adequate cross-examination of Brackett, who sold Bowling the murder weapon, would have shown that he testified pursuant to a covert deal struck with police who agreed not to pursue him for failing to register his firearms. The Kentucky Supreme Court rejected this claim as well. *Bowling II*, 981 S.W.2d at 550.

Bowling, however, has put forth no evidence of an agreement between Brackett and the government. Without any evidence supporting Bowling's claim, we cannot say that the Kentucky Supreme Court's decision to deny relief on these grounds was improper, let alone unreasonable.

### E.  Evidentiary Hearing

Bowling next claims that the district court erred by denying him a federal evidentiary hearing in conjunction with his habeas petition. Bowling seeks an evidentiary hearing to investigate one of his *Brady* claims and a few of his ineffective assistance of counsel claims. *See Brady v.*

---

[7] In his brief to this court, Bowling raises for the first time the possibility that his counsel was also ineffective for failing properly to cross-examine Detective Henderson. This claim was never presented to the Kentucky Supreme Court and was not even presented to the district court below. It is therefore defaulted.

In any event, we hold this claim has no merit. Bowling argues that an adequate cross-examination of Henderson would have revealed that the prosecution had no explanation for why Bowling committed the murders. Bowling argues that his attorneys inappropriately chose not to ask Detective Henderson about whether Bowling knew the Earleys or not, after being warned by the judge that this would open the door to hostile evidence and after consulting with Bowling himself. Bowling gives no reason to think this was an unreasonable decision, and even if it was, Bowling does not explain how it could have prejudiced his case, as the defense repeatedly stated throughout trial that there was no apparent motive.

*Maryland*, 373 U.S. 83 (1963). Specifically, Bowling wants to investigate whether the prosecution had any internal documents linking the Earleys to Donald Adams (and thus Donald Adams to the crime itself), and whether Bowling's counsel was defective for not further investigating Adams.[8] Bowling also seeks an evidentiary hearing to establish whether his counsel was ineffective for failing to investigate a potential deal the government made with Clay Brackett. Bowling was never granted any post-conviction evidentiary hearing by the Kentucky state courts, but requested an evidentiary hearing in the direct appeal and post-conviction

---

[8] Although Bowling raises this *Brady* claim as a part of his general request for an evidentiary hearing, *see* Appellant Br. at 51-54; Reply Br. at 16-17, Bowling does not discuss it outside of this context. Construing Bowling's appellate briefs generously, we will consider this part of Bowling's petition as stating a *Brady* claim as well as a claim that an evidentiary hearing should be granted on this *Brady* issue.

We reject the *Brady* claim. First, we note that this claim is procedurally defaulted. Bowling raised three *Brady* issues in the federal district court. He claimed that the prosecution did not disclose exculpatory notes on the results of a photo lineup, documents establishing the extramarital affairs of Tina Earley and drug use by both Earleys, and a deal with Clay Brackett. *See Bowling III*, 138 F. Supp. 2d at 879-885; J.A. at 109-12 (Pet. Br. in Dist. Ct.). He did not raise there the *Brady* claim he alludes to here: whether "[t]he prosecution failed to disclose evidence regarding Donald Adams' prosecution for drug charges, his involvement in a drug ring, and the victims' involvement with the police." Appellant Br. at 53. Moreover, this claim was not presented to the Kentucky Supreme Court. For these reasons Bowling's claim is defaulted.

Even if this claim were properly presented to the federal district court and the Kentucky Supreme Court, we would deny the claim on the merits. Under *Brady v. Maryland*, 373 U.S. 83 (1963), a prosecutor who suppresses evidence that is favorable to the defendant and "material either to guilt or to punishment" violates due process. *Id.* at 87; *see also United States v. Bagley*, 473 U.S. 667, 682 (1985) (explaining that materiality exists when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). In the present case, however, Bowling has not put forth any evidence to show that the prosecution improperly suppressed information about Donald Adams or that such a suppression would be material. We therefore reject Bowling's *Brady* claim.

proceedings. We conclude that the district court did not err in denying Bowling an evidentiary hearing.

The first hurdle that Bowling must jump is 28 U.S.C. § 2254(e)(2), which prevents federal courts from granting evidentiary hearings to petitioners who "fail[] to develop the factual basis of a claim in State court proceedings." The Supreme Court has explained that "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Michael Williams v. Taylor*, 529 U.S. 420, 432 (2000). This court has noted that "a finding of diligence would 'depend[] upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.'" *Sawyer v. Hofbauer*, 299 F.3d 605, 610 (6th Cir. 2002) (citing *Williams*, 529 U.S. at 435).

Bowling has met his burden under 28 U.S.C. § 2254(e)(2). Bowling repeatedly sought an evidentiary hearing in state court and, in those proceedings, introduced several documents attempting to corroborate the deal between Clay Brackett and the government and to establish the culpability of Donald Adams. We find this sufficient to show that Bowling was diligent in his state court litigation.

However, the fact that Bowling is not disqualified from receiving an evidentiary hearing under § 2254(e)(2) does not entitle him to one. We must determine then whether the district court abused its discretion by denying him an evidentiary hearing. *See Sawyer*, 299 F.3d at 610. This court has held that "a habeas petitioner is generally entitled to such a hearing if he alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing." *Id.* (internal quotations omitted). However, "[e]ven in a death penalty case, 'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or to require an evidentiary hearing.'" *Stanford v. Parker*, 266

F.3d 442, 460 (6th Cir. 2001) (citation omitted), *cert. denied*, 123 S. Ct. 136 (2002).

Bowling cannot show that the district court abused its discretion in denying him an evidentiary hearing. Bowling's claims that Donald Adams was the one who murdered the victims and that Clay Brackett had a deal with the government do not amount to anything more than conclusory allegations. At oral argument, Bowling's counsel argued that Bowling could not make more than bald assertions precisely because he had not had an evidentiary hearing. This circular logic, however, would entitle every habeas defendant to an evidentiary hearing on any issue. Without some evidence in support of Bowling's implausible theory of the case, which is analyzed above in our discussion of Bowling's ineffective assistance of counsel claims, we cannot say that the district court's decision to deny an evidentiary hearing was an abuse of discretion.[9]

## F. Prosecutorial Misconduct

Bowling's fourth set of claims relates to allegations of misconduct on the part of the prosecution. On direct appeal, the Kentucky Supreme Court considered the claims of prosecutorial misconduct together and found no merit in them. *Bowling I*, 873 S.W.2d at 178.

---

[9] To the extent that Bowling seeks relief by arguing that the Kentucky courts erroneously applied state law by denying him a post-conviction evidentiary hearing, we reject his claim. As we have noted in this opinion already, we generally do not review alleged violations of state law in federal habeas proceedings; there must be some independent constitutional error. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Insofar as Bowling may be claiming that this alleged state-law error violated due process, we believe that any potential error was not so fundamentally unfair as to violate Bowling's due-process rights. Insofar as Bowling may be claiming that this alleged error entitled him to an evidentiary hearing in federal court, we have considered and rejected this claim immediately above.

On habeas review, claims of prosecutorial misconduct are reviewed deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (citation omitted). Even if the prosecutor's conduct was improper or even "universally condemned," *id.*, we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. Once we find that a statement is improper, four factors are considered in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). Under AEDPA, this bar is heightened by the deference we give to the Kentucky Supreme Court's determination of Bowling's prosecutorial-misconduct claims. *See Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002) ("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights. But this case is before us on a petition for a writ of habeas corpus. So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.").

**1. The Presumption of Innocence**

Bowling's first claim is that the prosecutor negated the presumption of innocence during general voir dire by drawing the following analogy:

Okay; most of us know how to drive a standard transmission. That means that you are not going forward in this case or you are not going in reverse in this case, but you are sitting in neutral waiting to determine, based on the evidence you hear here, whether you go forward

or in reverse. Is there anybody here that is not in neutral? How did you like the way I viewed that? Thank you; I have no other questions, Judge.

J.A. at 3317-18. Bowling is correct when he states that a jury must be told a defendant is presumed innocent. *Taylor v. Kentucky*, 436 U.S. 478, 484-86 (1978). Given the context of the prosecutor's statement, it is clear that the prosecutor did not undermine that presumption; instead, the prosecutor was merely trying to make sure that the jury began the trial without presuppositions about the case. The same prosecutor had made the following remark only seconds before:

Do we all agree that this Defendant is, as he sits right here, innocent until proven guilty? We all understand that there has been no evidence heard in this case. And, as a result, if all of us had to vote right now, we would have to vote not guilty because we haven't heard any evidence. Do we understand that? Okay; now, in criminal cases, the burden of proving a person charged with a crime guilty beyond a reasonable doubt rests on the Commonwealth . . . . The burden is on us; do you understand that?

J.A. at 3315. Considering these statements together, it becomes apparent that the presumption of innocence was not negated in this case. There is therefore no impropriety here, and this claim is easily dismissed.

**2. Comments on Bowling's Silence**

Bowling also argues that the prosecution made constitutionally improper comments about his failure to testify. Bowling has two comments in mind. First, in the prosecution's closing argument in the guilt phase, the prosecutor argued that the defendant did have a motive:

But, see, we have proven a motive. There is no doubt he had one. See, something made him buy that gun from

Mr. Brackett before this killing. Something caused him to go out and sit by that fence row by that empty slat. Something made him do that. Something made him say that morning, "Today is the day." Something motivated him to plan it so that he caught Eddie and Tina Early there the every morning [sic] — or, at the very moment of their arrival at the cleaners. And, something motivated him to ram his car into theirs, and to empty that .357 into their bodies. We have proven to you that he had a motive. We can't tell you what it is, because only the man that pulled the trigger knows. But, we know that there is one.

J.A. at 4860-61. Bowling argues that the statement "only the man that pulled the trigger knows," was effectively a comment on the fact that Bowling did not testify at trial. Bowling did not, however, object to this statement at the time. Bowling also points to the prosecution's argument in the penalty phase where the prosecutor remarked, "What the defendant cannot get away from here is the planning, the premeditation, the physical evidence, his actions, the callousness of it, and his lack of seeming remorse." J.A. at 5116. Bowling objected to this statement at trial and argues here that it also was a comment on Bowling's silence.

The law is clear that the prosecution cannot comment on a defendant's decision not to testify at trial. *See Griffin v. California*, 380 U.S. 609, 615 (1965); *Rachel v. Bordenkircher*, 590 F.2d 200, 202 (6th Cir. 1978) (granting writ of habeas corpus and requiring a new trial when the prosecutor remarked that he could not say what happened because the defendant "won't tell us"). Yet, prosecutors can "summarize the evidence and comment on its quantitative and qualitative significance." *United States v. Bond*, 22 F.3d 662, 669 (6th Cir. 1994). When a statement indirectly comments on the defendant's decision not to testify, this court uses four factors to evaluate such a statement: "1) Were the comments 'manifestly intended' to reflect on the accused's silence *or* of such a character that the jury would 'naturally and

necessarily' take them as such; 2) were the remarks isolated or extensive; 3) was the evidence of guilt otherwise overwhelming; 4) what curative instructions were given and when." *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988), *cert. denied*, 489 U.S. 1100 (1989).

The prosecution's comments do not create constitutional error. Analyzing the above factors, we conclude that both of the comments are singular, inadvertent statements that only upon reflection marginally touch on Bowling's silence. They were not manifestly intended to reflect on Bowling's silence and likely would not have been taken as such. The prosecution's first comment, which was not objected to, that "only the man that pulled the trigger knows" was probably intended to show the jury that the prosecution had done everything it could to show motive; the comment was likely not intended to highlight the defendant's silence. The second statement seems even less appropriately construed as a comment on the defendant's silence — the prosecution was merely emphasizing its view that the defendant's actions at the time of the crime (rather than his silence at trial) demonstrated no remorse. *See Lent*, 861 F.2d at 975 (stating that there can be no constitutional error if "some other explanation for the prosecutor's remarks is equally plausible"). We therefore conclude that such comments do not constitute constitutional error.

### 3. Diminished Jury Responsibility

Bowling argues that the prosecutor diminished the jury's responsibility for deciding whether to apply the death penalty. Bowling points to several comments made at the penalty phase that he alleges took the responsibility for the death sentence away from the jury and placed it on the prosecution, the legislature, and society.

The Supreme Court has established that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to

believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29. In *Caldwell*, the Supreme Court reversed the defendant's conviction after the prosecutor explicitly argued that the responsibility for the death penalty was not with the jury, by telling the jurors "your decision is not the final decision." *Id.* at 325. In *Dugger v. Adams*, 489 U.S. 401 (1989), the Court held that "to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id.* at 407. Bowling cites several statements made in closing argument that allegedly violate *Caldwell*, but none of these claims have merit.

A number of the statements Bowling puts forward clearly do not constitute *Caldwell* violations. Bowling claims that the prosecutor improperly told the jury to find the death penalty because Bowling was not ill but mean, because the legislature had deemed the death penalty appropriate when it devised the legislative scheme, and because Bowling might be released on parole otherwise. We note initially that Bowling's characterizations of the prosecution's remarks are somewhat inaccurate and exaggerated. In any event, however, Bowling has not shown how the prosecution's remarks improperly described the role assigned to the jury by local law as required by *Caldwell*.

Only two of the prosecutor's statements are potentially serious violations of *Caldwell*. The first statement was made by the prosecutor who, when addressing the jury, stated that the jurors could not "*recommend* the death penalty unless [they] first decide that an aggravating factor exists." J.A. at 5113-14 (italics added). Bowling alleges that the jury's responsibility for the death penalty was unconstitutionally lessened by the use of the word "recommend." We have held, however, that this statement does not misstate local law because Kentucky statutes also use the word "recommend." *See* KY. REV. CODE ANN. § 532.025(1)(b); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1101 (6th Cir. 1990) (en banc)

(holding that, under *Dugger*, the use of the word "recommend" under Kentucky law did not misstate the jury's role and therefore could not amount to a *Caldwell* violation).[10] As a result, this statement was not made in violation of *Caldwell*.

The second potentially problematic statement was also made by the prosecution in its closing:

> That is an extraordinary case, you see. Multiple homicides, intentional killings; you kill one person. Don't kill everybody else, the other witnesses. Extraordinary cases. In Kentucky, the death penalty applies. And, our Legislature has said in those aggravated murder cases that the death penalty may be imposed by a jury. Potter Stewart, a former Justice of the United States Supreme Court, said while dealing with death penalty cases. "The expression of society's moral outrage is essential in an ordered society that asks its

---

[10]There is a violation of state law here, however, because during the period between *Caldwell* and *Dugger* (and before the trial in this case), the Kentucky Supreme Court held that the word "recommend," while technically accurate, improperly suggested to the jury that they were "merely one step in a long process." *Tamme v. Commonwealth*, 759 S.W.2d 51, 53 (Ky. 1988); *cf. Kordenbrock*, 919 F.2d at 1101 (holding that there was no violation of state law because the trial and appeal in the case at bar happened before the decision in *Tamme* and the decision in *Tamme* was not retroactive).

We do not believe this violation of state law is so egregious as to make the prosecutor's misconduct a violation of due process. Although the prosecutor erroneously used the word "recommend," it was an isolated remark and clearly not intended to prejudice the jury — the prosecutor routinely used other more appropriate words, such as "fix[]" and "impose" throughout his closing argument. J.A. at 5110, 5113. In fact, his closing argument ended with the statement, "I am asking you to sentence T.C. Bowling to death." J.A. at 5120. In this context, it is clear that the jury was well aware that it had responsibility of deciding whether the death penalty should apply. We therefore hold that any potential violation of state law under *Tamme* did not violate Bowling's due-process rights.

citizens to rely on legal processes rather than self-help to vindicate their wrongs." He continued — and this is critical — "because," he said, "when people begin to believe that organized society is unwilling or unable to impose on criminal offenders the punishment they deserve, then the seeds of anarchy will soon be sewn."

J.A. at 5111-12. Bowling argues that this quotation, which comes from Justice Stewart's concurrence in *Furman v. Georgia*, 408 U.S. 238, 308 (1972), and was repeated in *Gregg v. Georgia*, 428 U.S. 153, 183 (1976), violates the principles announced in *Caldwell*. However, it is clear that there is nothing in this statement that explicitly misinforms the jury of its role. Bowling's argument here is better conceptualized as a claim under *Viereck v. United States*, 318 U.S. 236 (1943), which held that the incendiary nature of a prosecutor's patriotic remarks which were "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice" jeopardized the defendant's right to a fair trial. *Id.* at 247. This court, however, has stated that unless the remarks were "calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible," *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991), and so a case-by-case analysis is required.

In *Solivan*, we held that a prosecutor violated the defendant's right to a fair trial when he urged the jury to "tell her and all of the other drug dealers like her . . . that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky . . . [interrupted by the court]" *Id*. at 1148. An earlier case, *United States v. Alloway*, 397 F.2d 105 (6th Cir. 1968), had held not improper a prosecutor's statement that "You the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be tolerated, that we're not going to tolerate . . ." *Id.* at

113. The *Solivan* court distinguished *Alloway* by noting that the comments in *Alloway* "constituted a general plea which did not even specifically refer to the crime of armed robbery," and that "armed robbery was not and is not the specific focus of national attention as is the drug problem." *Solivan*, 937 F.2d at 1155. In contrast, in *Solivan*, "the prosecutor went beyond . . . a mere innocuous reference to the community or societal need to convict guilty people . . . and went so far as to urge the jury to send a message to the community, to defendant and 'all of the drug dealers like her' by convicting defendant." *Id.* In *Solivan*, the prosecutor suggested that through a conviction "the jury . . . would help keep its community in northern Kentucky free of the drug trade."

In *Buell v. Mitchell,* 274 F.3d 337 (6th Cir. 2001), we again addressed the distinction between *Alloway* and *Solivan*, denying a writ of habeas corpus to a defendant on the basis of a prosecutor's remark that "the jury should 'send a message to the Robert Buells of the world' that 'if you're going to commit this kind of a crime then you better be expecting to pay the ultimate price, yourself." *Id.* at 365. We noted that the prosecutor in *Buell* "was not making a statement regarding the jury's ability to address a specific societal problem," but was merely making "a general statement regarding the need to convict people who commit sexual molestation and murder." *Id.*

Under our binding precedents, we hold that the prosecutor's statement in this case is not so improper as to violate Bowling's due-process rights. The statement that Bowling complains of is a general reference to the societal need to punish guilty people; the prosecutor in this case did not "attempt to compare or to associate the defendant with a feared and highly publicized group, such as drug dealers," *Solivan*, 937 F.2d at 1154, but was attempting only to make "a general statement regarding the need to convict people who commit . . . murder," *Buell,* 274 F.3d at 365. Moreover, the prosecutor did not state that the jurors' individual communities would be safer if the defendant were convicted,

as was the case in *Solivan*. Although we will not say that the giving of this statement was proper, *see State v. Byrd*, 512 N.E.2d 611, 615-16 (Ohio 1987) (calling the same argument "not proper" and "caution[ing] prosecutors to avoid such arguments"), we do not find it, under the circumstances of this case, so improper as to render Bowling's trial fundamentally unfair, *see Macias*, 291 F.3d at 453-54 (noting that the normally deferential review of prosecutorial misconduct is even more deferential under AEDPA).

**4. The Golden Rule**

Bowling claims that the prosecutor also committed misconduct when, after discussing the testimony of Bowling's family, he remarked in the penalty phase:

> It is always difficult when a family member testifies on behalf of someone charged with a crime. They are his family. And, what do you expect? Don't you know that Mr. and Mrs. Early and Ms. Morgan would give anything in the world to have had the opportunity to beg for their children's life on April 9, 1990. Please don't hurt our children. And, don't you know, Chris [the injured child], if he could, would love to have plead for the life of his mother and father.

J.A. at 5115-16. Bowling argues that the prosecutor's comments here are similar to the forbidden Golden Rule, which "tends to pressure the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability." *Dean v. Commonwealth*, 777 S.W.2d 900, 904 (Ky. 1989) (finding error in an extended statement glorifying the victim of a homicide).

This comment, however, was an isolated remark that did not suggest to the jury that they should decide the case on a basis other than Bowling's culpability. This court has recently held a more dangerous comment not to be improper, let alone a denial of due process. *Simpson v. Jones*, 238 F.3d

399, 409 (6th Cir. 2000) (upholding the statement, "Ask yourself if you had a loved one, or had a relative, or a friend, who was in a situation like that"). Given the *Simpson* precedent, by which this panel is bound, we must conclude that the statement that Bowling complains of is not so fundamentally unfair as to constitute a denial of due process.

**5. Finding of Statutory Aggravator**

Bowling next claims prosecutorial misconduct amounting to a denial of due process in the fact that the prosecutor told the jury, during the eligibility section of the penalty phase, that because it had already found the aggravating circumstance in the guilt phase of the trial (by finding Bowling guilty of intentional double homicide), it need not again consider whether there was an aggravating circumstance in the penalty phase, because under Kentucky law, the aggravating circumstance was already shown. *See* KY. REV. CODE ANN. § 532.025(2)(a)(6) (making an offender eligible for the death penalty when "[t]he offender's act or acts of killing were intentional and resulted in multiple deaths"). The prosecutor remarked as follows:

> You cannot recommend the death penalty unless you first decide that an aggravating factor exists. Did the Defendant, Thomas Clyde Bowling, Jr. intentionally cause the death of more than one person. I don't have to remind you that you found that last Friday.

J.A. at 5113-14.

This instruction does not appear to violate Bowling's constitutional rights. First, an aggravating circumstance may be found at either the guilt or penalty phase. *See Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994). Second, *Tuilaepa* notwithstanding, the jury instructions in this case did in fact require the jury to find the aggravating circumstance beyond a reasonable doubt in the penalty phase as well as in the guilt

phase, J.A. at 5106, which the jury found, J.A. at 5138. There is therefore no error.

### 6. Denigration of Bowling's Mitigation Evidence

Finally, Bowling argues that the prosecution improperly told the jury that it did not have to consider Bowling's mitigation evidence. Bowling cites to the part of argument where the prosecutor remarked:

It is a strong, strong, strong case against this Defendant. And, what about mitigating circumstances that you are instructed to consider, *if you wish*; Mitigating circumstances, whether there are any mitigating circumstances that would make this entire event less serious, the brutal murder of two young lives. Are there any such circumstances? Are there?

J.A. at 5116 (italics added). Bowling argues that the italicized phrase makes it seem that the jury does not need to consider the mitigating evidence, which it is constitutionally required to do under *Boyde v. California*, 494 U.S. 370, 380 (1990). This could be an improper attempt to suggest to the jury they may decide not to consider mitigating evidence, but it seems more likely to be interpreted as a simple argument that there is no mitigating evidence. *See Lent*, 861 F.2d at 975 (noting that there can be no constitutional error if "some other explanation for the prosecutor's remarks is equally plausible"). Even if this is error, however, it is an isolated, unintentional error with no effect on the jury. The jury was repeatedly told in the instructions that they had to consider mitigating evidence; for example, an instruction states that the jury "shall consider such mitigating or extenuating facts and circumstances as have been presented to you." J.A. at 5106. Bowling has therefore not made out a violation of due process here.

In summary, we find none of Bowling's allegations of prosecutorial misconduct, individually or together, violate due process.

### G. Denial of Fair Jury

Bowling's next set of claims is that the jury empaneled to hear his case was unfairly selected. Bowling has two independent claims for relief. His first argument is that one of the jurors actually seated was an "automatic death penalty" juror who should have been excluded. Bowling's second argument is that three jurors, whom Bowling eventually struck with his peremptory challenges, should have been dismissed for cause. These claims do not have merit.

Bowling's first claim of improper jury selection is that Charles Livingston, Juror # 650, should have been excluded for cause as an "automatic death penalty" juror. *See Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (noting that "a capital defendant may challenge for cause any prospective juror . . . who will automatically vote for the death penalty in every case"); *see also Wainwright v. Witt*, 469 U.S. 412, 424 (1985) ("[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.") (internal quotation omitted). In determining whether a juror is biased, "deference must be paid to the trial judge who sees and hears the juror." *Witt*, 469 U.S. at 426. Even before AEDPA, the trial court's finding that a juror was impartial was entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (noting that juror partiality is a question of historical fact). The question is not whether the trial judge was wrong or right in his determination of impartiality, but merely whether his decision was "fairly supported by the record." *See Witt*, 469 U.S. at 433 (internal quotations omitted).

The colloquy between Livingston, the trial court, and the two sets of counsel was extensive:

> *Q [(Pros.)]:* If you were selected as a jury — juror, and along with your eleven jurors in a particular case concluded that the defendant was guilty of intentional murder, then could you in the sentencing phase or the penalty phase consider the entire range of penalties, twenty years to life, life without parole, or death?
>
> *A:* One?
>
> *Q [(Court)]:* And, decide on one of them; but, could you consider all three penalties?
>
> *A:* I could consider them all.

J.A. at 3534-35. The court then asked whether Livingston could vote for the death penalty, and he answered affirmatively. The court then asked:

> *Q:* By like token, even though the Defendant was found guilty beyond a reasonable doubt of intentional murder, if the other facts of the case made it appropriate that only twenty years be fixed as the penalty, you could do that, too?
>
> *A:* Yes.

J.A. at 3536. However, Livingston was then asked questions by defense counsel. He first equivocated on whether he could necessarily or automatically give the death penalty, stating, "Well, you know, in a trial if it is proven that he is guilty . . ." J.A. at 3539. He was then asked, "but, given that situation of a multiple intentional killing, found guilty beyond a reasonable doubt, that would lead you to automatically vote for the death penalty?" J.A. at 3540-41. He responded, "Yes." J.A. at 3541. Livingston later also stated that he felt strongly about that. Eventually, the Court intervened and asked some direct questions:

> *Q [(Court)]:* Would you consider if mitigating circumstances were proven to you along with the rest of the case?
>
> *A:* I would try.
>
> *Q:* Would you consider all of the facts in the case, not just the fact that he had committed a multiple killing, but circumstances of how, why, when, and under what mental condition and all that sort of thing?
>
> *A:* Uh-huh.
>
> *Q:* Would you consider all of those factors?
>
> *A:* Yes, (inaudible).
>
> *Q:* Then, let me know whether you believe that in every case where a defendant is convicted of an intentional killing that the death penalty would automatically be given or should automatically be given? Do you believe that? Are you sure you understand what I am saying now?
>
> *[Some clarification.]*
>
> * * *
>
> *A:* Well, what I'm saying now, you are saying if a man takes another person's life intentionally — you know, I feel that when a man takes another life, he should be punished for that. But, if he takes someone's life and he is not in his right mind, then I would consider (inaudible).
>
> *Q:* Would you consider other facts that the law says are mitigating circumstances? Well, I take it, that if the jury — if you should be on a jury and you find the Defendant in a particular case guilty of intentional murder, you wouldn't automatically, then, say death penalty and nothing else considered?
>
> *A:* No, I would have to consider the other options.
>
> *Q:* You could consider all of them including twenty years, the minimum.
>
> *A:* Yes; I definitely don't want, you know, (inaudible) see someone take the death penalty (inaudible).

*Q:*     Deserve it based upon your finding of all the facts — in your consideration of all of the facts in the case?

*A:*     Right.

*Q:*     Not just that one fact, that it was a multiple killing?

*A:*     Yes.

J.A. at 3542-46. Livingston was then moved out of the room. Bowling's counsel challenged him for cause, but the motion was denied.

Though we recognize this is a close question, ultimately Livingston is not an "automatic death penalty" juror within the meaning of *Morgan*. Livingston did initially state that he would automatically give the death penalty to those who met the aggravating factor, but later he expressly said that he would consider mitigating evidence. The trial court asked Livingston thorough questions, and Livingston's responses showed that he was not someone who would automatically impose the death penalty in all cases. *Morgan* requires only that a juror be excluded if he would automatically "vote for the death penalty without regard to the mitigating evidence," something that Livingston explicitly said he would not do. *Morgan*, 504 U.S. at 738. This being the case, given the deference we give to trial courts' determinations of impartiality, we find that there is no constitutional error here, and alternatively, that the Kentucky Supreme Court's decision to that effect, *Bowling I*, 873 S.W.2d at 177, was not objectively unreasonable.

Bowling's second claim is that he was forced to use peremptory challenges to strike three other jurors who should have been disqualified for cause, and that he could have used these peremptories to exclude Livingston. The Supreme Court has made it clear that this is not a constitutional injury. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not

mean the Sixth Amendment was violated."); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) (noting that there is no violation if the defendant "elects to cure [the] error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat"). There is therefore no constitutional violation here.

### H. Proportionality Review

Bowling's last claim for habeas relief is that the review by the Kentucky Supreme Court for proportionality was unconstitutional. Bowling claims that the Kentucky Supreme Court erred in not setting aside his death sentence, because it was excessive and disproportionate to the penalty imposed in similar cases. This claim fails.

The Supreme Court has held that the Constitution does require proportionality review, but that it only requires proportionality between the punishment and the crime, not between the punishment in this case and that exacted in other cases. *See Pulley v. Harris*, 465 U.S. 37, 50 (1984). Although "[t]here is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review," *McQueen v. Scroggy*, 99 F.3d 1302, 1333-34 (6th Cir. 1996), *cert. denied*, 521 U.S. 1130 (1997), Kentucky law does require the Kentucky Supreme Court to engage in comparative proportionality review. *See* KY. REV. CODE ANN. § 532.075(3)(c). Although claimed violations of state law are generally not cognizable on habeas, the Supreme Court has left room for the argument that a state-law error could, potentially, "be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment." *Harris*, 465 U.S. at 41. Bowling therefore argues that the Kentucky proportionality requirement creates a due-process interest that the Kentucky Supreme Court violated by not finding his sentence disproportionate.

As an initial matter, we question whether Kentucky law has created a due-process interest here. Kentucky requires that its Supreme Court assess "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," and also requires it to "include in its decision a reference to those similar cases which it took into consideration." KY. REV. CODE ANN. § 532.075(3)(c) & (5). This circuit recently held that Tennessee's proportionality statute, which is similar to the statute here, did not create a liberty interest because "the statute only tells the supreme court what questions it must ask. It does not tell the supreme court *how* it must do so, and it does not even define the terms (*e.g.,* arbitrariness) of these questions. As a result, [the defendant] has no federal due-process right that was violated." *Coe*, 161 F.3d at 352 (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989)). Similarly here, the statute only explains what the Kentucky Supreme Court needs to consider — similar cases, the crime, and the defendant — it does not tell that court how to make this decision. This suggests under *Coe* that no due-process right exists.

Even if there were a due-process interest here, however, the Kentucky Supreme Court did not violate it. The Kentucky Supreme Court, in its decision on direct appeal, did conduct a comparative proportionality review and concluded it did not show that "this sentence of death is either excessive or disproportionate to the penalty proposed in other capital cases." *Bowling I*, 873 S.W.2d at 181. In support, the Kentucky Supreme Court cited four of its cases and incorporated a list of others. *Id.* at 181-82.

Bowling argues that the Kentucky Supreme Court only compared Bowling's sentence to other crimes where the death penalty was imposed, but should have compared Bowling's sentence to similar crimes where the death penalty was not imposed. There is no clear support in Kentucky law for the proposition that the Kentucky Supreme Court must also consider those additional cases. In fact, Bowling notes this,

stating that "Kentucky has limited review to cases in which the death penalty was imposed." Appellant Br. at 121.

Bowling's recognition that Kentucky law does not require consideration of those additional cases reveals that he is actually arguing that Kentucky has an ineffective framework for assessing proportionality rather than a claim that Kentucky misapplied its own framework. This forecloses Bowling's due-process argument, however, for there is no violation of due process as long as Kentucky follows its procedures. We note that we also have specifically rejected this type of challenge to Ohio's proportionality statutes, stating:

> [T]he Ohio Supreme Court has indicated that proportionality review is required under Ohio Rev. Code § 2929.05(A) to the extent that the reviewing court must consider cases already decided by the court in which the death penalty had been imposed. Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison. By limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed.

*Buell*, 274 F.3d at 368-69 (citations omitted). As a result, we find Bowling's proportionality argument unconvincing and dismiss his corresponding claim for relief.

### III. CONCLUSION

After having reviewed the record, the briefs, and the various earlier opinions in this case, and after oral argument, we conclude that Bowling has not made out a claim for habeas corpus relief, either by virtue of a single error or through the cumulative effect of multiple errors. We also conclude that his claim for an evidentiary hearing should be

denied.  We therefore **AFFIRM** the judgment of the district court.