CLAY, Circuit Judge,
concurring in part and dissenting in part.
The Sixth Amendment confers on defendants an absolute right to an impartial jury. Adherence to this constitutional guarantee is literally a matter of life and death in the context of a capital case, where a state may not impose a death sentence if even a single member of the empaneled jury was not impartial due to his or her views on capital punishment.
The issue concerning the “automatic death penalty” juror does not in this case turn on the deference that is rightfully owed to a trial court’s credibility determination, as neither party is questioning the juror’s sincerity respecting his views on the death penalty. The pertinent issue in this case is whether the juror, given the totality of his voir dire testimony, could reasonably be expected to fairly apply the law when asked to do so by the court. Supreme Court precedent instructs that a juror’s affirmative assurance alone, irrespective of credibility, is not dispositive, because “[i]t may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so.” Morgan v. Illinois, 504 U.S. 719, 735, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). It is truly difficult to fathom that any objective party could review the testimony in this case and arrive at the conclusion reached by the majority; Juror 139 repeatedly indicated his preference and belief that anyone who committed murder, and was of a sound mind when they did so, deserved to die and should be put-to death. In view of the unambiguous record respecting the predetermined nature of Juror 139’s death penalty vote, I dissent from Part III.C of the majority opinion.
BACKGROUND
James Earl Trimble, on the evening of January 21, 2005, senselessly killed his girlfriend, her minor son, and a complete stranger, altering irrevocably the lives of many others who endured the loss of their loved ones on that fateful night. Trimble was indicted on three counts of aggravated murder, each including a death penalty specification (e.g., murder of a child under 13 years of age, the killing of two or more people, murder as part of a prior calculation and design, and murder in connection with a kidnapping). Trimble’s trial was split into two segments: the guilt phase and the sentencing phase. In the first phase, Trimble was found guilty on all counts including the death penalty specifications. In the second phase, the jury was instructed to decide, by weighing the aggravating factors associated with each of the murders (ie., the specifications) against Trimble’s mitigation evidence, whether or not Trimble should be sentenced to death. The jury found that the aggravating factors outweighed the mitigating circumstances and accordingly voted for the death sentence. At issue in this appeal is whether one of the empaneled jurors during the sentencing phase of Trimble’s trial could serve as an impartial juror by following the law and fairly considering Trimble’s mitigation evidence.
Although the majority excerpts a few of the relevant passages from Juror 139’s testimony, the majority opinion fails to offer the full context and flow of his voir dire. A more detailed review is necessary because a reviewing court is required to “examine the [entire] context surrounding” the prospective juror’s questioning. Darden v. Wainwright, 477 U.S. 168, 176, 106 *785 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The following section presents a fuller summary of Juror 139’s voir dire testimony.
At the outset, the district court explained Ohio’s bifurcated sentencing scheme to Juror 189. The judge asked if Juror 139 could vote for a death sentence if the aggravating factors outweighed the mitigation evidence, and Juror 139 responded, “Yes.” (App’x Vol. 5, Voir Dire Tr. — Part 8, at 1312.) He then asked if Juror 139 could instead vote for a life sentence, if the reverse was true, tó which Juror 139 responded, ‘Yeah.” (Id.) He also affirmed that he would, in general, be able to follow the judge’s instructions.
It was then the prosecutor’s turn to ask questions. He also began by explaining, for a second time, the separate phases of a death penalty trial in Ohio — first, the guilt phase, followed by the sentencing phase. Juror 139, again, initially said that he understood the process. (Id. at 1313 (“Yes, I understand that.”).) However, Juror 139’s responses to the prosecutor’s questioning offered the first indication that he might not be able to follow the law or the judge’s instructions, but would instead be an automatic death penalty juror. When Juror 139'indicated that he might be confused about the sentencing phase, the prosecutor asked directly whether Juror 139 thought that Trimble was “automatically ... subject to the death penalty,” if he was found guilty. (Id. at 1314-15.) As recognized by the majority, see Maj. Op. at 774, Trimble responded, “If I find him guilty,” “Yeah,” and “If he killed three people he should [get the death penalty].” (Id. at 1315.) Despite his unequivocal response to a direct question that indicated his misconception respecting his duties, Juror 139 again asserted that he understood that “in Ohio the law is that you don’t make [the death penalty] decision at that time,” ie., immediately as a result of finding the defendant guilty. (Id.)
The prosecutor thereafter explained to Juror 139 for the third time (the prosecutor’s second attempt) that in Ohio, sentencing is decided after the guilt phase of the trial. Juror 139 asked a number of questions that indicated his confusion. Yet, the prosecutor pressed forward stating, ‘You’re understanding that right one or the other [meaning life or death] and something that happens after the trial, okay?” (Id. at 1316.) Juror 139 assented that he understood that much. But immediately following this exchange, Juror 139 further demonstrated that he would be an automatic death penalty juror. When asked for his opinion on the death penalty, he acknowledged that it served a purpose and then, unprompted, he asked rhetorically, “Because if you take a life why should you be allowed to live?” (Id. at 1317.) The prosecutor responded by reminding Juror 139 that a person convicted of murder might be entitled to live under Ohio law. Juror 139 responded, by asking, “Depending on why [the defendant] did it[ — committed the murder]?” (Id.) It was plain from this exchange that Juror 139 remained confused and ignorant of his obligation to weigh mitigation evidence. For that reason, the prosecutor carefully explained to Juror 139 for the fourth time (his third attempt) that the death penalty was only appropriate if the jury had decided during the sentencing phase that the aggravating factors outweighed Trimble’s mitigation evidence. Juror 139, again, in very few words, indicated that he supposedly understood the information being conveyed to him by the prosecutor.
The prosecutor next told Juror 139 that it was Trimble’s “job ... to convince you to not vote for the death sentence and [he] ha[s] a right to present that evidence.” (Id. at 1318.) The judge sustained an *786 objection to the prosecutor’s editorializing, as the defense believed the prosecutor was impermissibly suggesting to Juror 139 that there would be a presumption in favor of the death penalty after finding Trimble guilty. The prosecutor rephrased, asking whether Juror 139 would listen to the mitigation evidence and could wait to “make up [his mind] about [the] penalty.” (Id.) Juror 139 answered, “Yeah,” to both questions. (Id.) Finally, the prosecutor asked whether the juror could follow the judge’s instructions and return a recommendation for a life sentence if that is what the evidence supported. Juror 139 again answered affirmatively.
Next, it was defense counsel’s turn to ask questions. However, Juror 139’s responses to those questions plainly revealed his persistent ignorance with respect to a juror’s duty to consider mitigating evidence, and in unprompted remarks, he reaffirmed his preference for applying the death penalty to anyone who was found guilty of murder. In response to being asked whether he had ever been called on to discuss his views on the death penalty, he responded not by answering the question, but by clearly stating his view, “I just, if you’re guilty, without a reasonable doubt, then if you take somebody’s life your life should go — you shouldn’t be allowed to live either.” (App’x Vol. 5, Voir Dire Tr. — Part 9, at 1321.) This response constituted the third time that Juror 139 had made an unequivocal statement indicating that he would be an automatic death penalty juror. He followed up by confirming that his mindset as a juror would be “[a]n eye for an eye” and “[w]hat goes around comes around.” (Id. at 1322.) Juror 139 made clear in no ambiguous terms that Trimble deserved to die, so long as he was found guilty.
At this point, defense counsel explained to Juror 139 for the fifth time (his first attempt) that in Ohio a death penalty trial involved two stages, and that a jury, necessarily, could only decide whether Trimble should be sentenced to death after the jury had already found him guilty of aggravated murder with the death penalty specifications, and that the later determination regarding the penalty was separate and apart from Trimble’s guilt. The defense counsel meticulously walked through the guilt phase of the trial — explaining to Juror 139 that in order to find Trimble guilty on all counts, the jury would have to find that the prosecution met its burden of establishing each of the death penalty specifications: the killing of two or more people; that the murder was part of a prior calculation and design; and that one of the murders happened in the course of a kidnapping. Defense counsel thereafter explained that it was only at this point, after the jury had found Trimble guilty of aggravated murder with the death penalty specifications, that the jury could weigh those specifications against Trimble’s mitigation evidence and decide if he should be sentenced to death. When asked if he understood after each step of the explanation, Juror 139 simply replied, ‘Yeah,” or “Uh huh.” (Id. at 1322-25.) At the end of that dialogue he offered his understanding of process:
If he knew — what you guys are saying, if he already knew what he was doing, or whatever, then he should get the death penalty. But if he’s like for some reason off and whatever, then maybe just prison or something like that, is that what you mean?
(Id. at 1325.) It is evident from this statement that even after defense counsel’s thorough explanation — the fifth explanation that Juror 139 had received — Juror 139 continued to conflate the guilt and penalty phases. He failed to comprehend that mitigation evidence was distinct from potential affirmative defenses to aggravat *787 ed murder at the guilt phase of the trial, such as insanity or mental incapacity. Juror 139 previously stated as much during his voir dire to screen for bias from pretrial publicity: “From what I understand that he’s already guilty, but he’s just trying to figure out if he’s — if it’s insanity or not.” (App’x Vol. 5, Voir Dire Tr. — Part 8, at 1303.) Juror 139’s view was simply that if Trimble was guilty of aggravated murder then he should be sentenced to death.
Defense counsel made a final attempt to resolve Juror 139’s misconceptions. He explained to Juror 139 for the sixth time (and at great length) the distinctions between the guilt and penalty phases of a capital trial — specifically identifying to Juror 139 what was so troubling about his previous explanation of the penalty phase. Defense counsel highlighted for Juror 139 that the jury would necessarily have to find that the murders were planned and purposeful prior to the penalty phase, if the jury was then being asked to weigh mitigation evidence in consideration of the death penalty. Juror 139 thereafter made a final attempt to explain his understanding with respect to whether he would be an automatic death penalty juror — that attempt failed just as clearly as had his earlier attempt at offering his understanding of his role on the jury. He stated:
If he knew what he was doing at the time, had a clear head, knew exactly, planned out, then he should get the death penalty. But if he was under the influence or something, or not quite right in the head, if you can prove that, then maybe it shouldn’t be so harsh. Either way is bad but then you get the prison time.
(App’x Vol. 5, Voir Dire Tr. — Part 9, at 1329 (emphasis added).) Defense counsel shortly thereafter concluded his questioning; presumably believing that he could easily have Juror 139 removed from the jury pool as an automatic death penalty juror.
At that point, the judge explained to Juror 139 for the seventh time the distinction between the two phases of the trial because he “just want[ed] to make sure” that Juror 139 truly understood the process. (Id.) He then asked whether Juror 139 knew that it was his obligation to follow the court’s instructions. Juror 139 replied affirmatively, just as he had at the very beginning of his voir dire testimony. The judge found that Juror 139’s testimony overall supported a finding that Juror 139 would consider the mitigation evidence and that he would follow the court’s instructions, and on those bases, the judge overruled defense counsel’s objection that Juror 139 should be excused for cause as an automatic death penalty juror. There is no reading of these facts under any standard of review that should lead a reasonable and objective person to conclude that Juror 139 would be able to faithfully execute his duties on the jury by impartially sitting in judgment and following the law, which would require him to consider the possibility of a life sentence even after he found that the murders were committed by an individual who was of a sound mind and who had planned the killings in advance.
DISCUSSION
I. Standard of Review
As an initial matter, it is worth addressing the standard of review. Despite the majority’s contentions, the law of this Circuit clearly commands that de novo review applies to a case such as this one, where the state court did not consider the claim on the merits because it only applied plain error review after incorrectly finding that the claim was procedurally defaulted.
*788 The Antiterrorism and Effective Death Penalty Act (“AEDPA”) applies to habeas cases only where a state court has reviewed the petitioner’s claim on the merits. Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011); see also Jackson v. Smith, 745 F.3d 206, 209 (6th Cir.2014) (“[C]laims not ‘adjudicated on the merits’ by the state court are given plenary review by a federal habeas court, even where AEDPA otherwise applies.”); Burton v. Renico, 391 F.3d 764, 770 (6th Cir.2004). In this case, as the majority concedes, the state incorrectly applied its procedural default rule. It therefore applied plain error in reviewing the trial court’s failure to remove Juror 139 for cause.
Plain error review “is not equivalent to a review of the merits”; rather, it “is more properly viewed as a court’s right to overlook procedural defects to prevent manifest injustice.” Lundgren v. Mitchell, 440 F.3d 754, 765 (6th Cir.2006); accord Frazier v. Jenkins, 770 F.3d 485, 496 n. 5 (6th Cir.2014) (“We have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference.”); see also State v. Mammone, 139 Ohio St.3d 467, 13 N.E.3d 1051, 1070 (2014) (“We take notice of plain error with the utmost caution, under exceptional circumstance and only to prevent a miscarriage of justice.” (internal quotation marks omitted)). Thus, this Court has a well-established precedent of declining to review claims as being procedurally defaulted when the state court has only reviewed the claim for plain error, relying on the rationale that the state court never reviewed the claim on the merits. See, e.g., Taylor v. McKee, 649 F.3d 446, 450-51 (6th Cir.2011); Girts v. Yanai, 501 F.3d 743, 755 (6th Cir.2007); Keith v. Mitchell, 455 F.3d 662, 673 (6th Cir.2006). Lund-gren forecloses any notion that plain error analysis constitutes a review on the merits. The only case relied on by the majority to suggest otherwise — Fleming v. Metrish, 556 F.3d 520 (6th Cir.2009) — is not controlling because it was decided later in time, and one panel of this Court cannot overrule the published decision of a prior panel. United States v. Moody, 206 F.3d 609, 615 (6th Cir.2000) (“[T]he earlier determination is binding authority unless a decision of the United States Supreme Court mandates modification or this Court sitting en banc overrules the prior decision.”). AEDPA is plainly inapplicable and the majority’s attempt at injecting ambiguity' into our Circuit precedent is completely unconvincing. No deference is due to the judgment of the state’s appellate courts that reviewed the issue only for plain error. Lundgren, 440 F.3d at 765.
A juror’s ability to impartially apply the law is a factual issue, Franklin v. Anderson, 434 F.3d 412, 426 (6th Cir.2006), and the “trial court’s findings of juror impartiality may ‘be overturned only for “manifest error.” ’ ” Mu’Min v. Virginia, 500 U.S. 415, 428-29, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (quoting Patton v. Yount, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961))). However, manifest error simply means that there is clear and convincing record evidence that the trial court’s decision was incorrect. Irvin, 366 U.S. at 724-25, 81 S.Ct. 1639.
II. Analysis
“Jurors who cannot apply the law are not impartial.” Franklin, 434 F.3d at 427. Thus, “[a] juror who would automatically vote for the imposition of the death penalty without weighing the aggravating and mitigating evidence presented must be removed for cause, and a failure of the trial court to do so rises to the level of constitutional error sufficient to grant relief.” *789 White v. Mitchell, 431 F.3d 517, 538 (6th Cir.2005). This Court has no choice but to reverse a sentence where a biased juror has been seated. Franklin, 434 F.3d at 427. Furthermore, attempts to rehabilitate a juror will not suffice when it is clear that the juror has failed to comprehend his responsibilities, id, because this Court’s inquiry “does not end with a mechanical recitation of a single question and answer.” Darden, 477 U.S. at 176, 106 S.Ct. 2464.
The majority frames this issue as concerning the “special deference” due to a trial judge’s credibility determinations, because only the trial judge is in the position to take note of a prospective juror’s “demeanor” and “body language.” Maj. Op. at 778-79. That contention is unpersuasive in the context of this case. Demeanor and body language are only relevant when the juror’s credibility is at issue, typically, because the testimony is inconsistent, the juror’s answers are ambiguous, or because the trial judge has indicated that credibility is an issue. None of those factors are present in this case. The trial judge did not invoke credibility as being at issue; he simply determined that Juror 139’s attempts to explain his understanding of the sentencing procedure, along with his affirmation that he would follow the judge’s instructions, were sufficient to overcome his statements indicating a clear preference for the death penalty. This determination, to credit certain snippets of testimony reflecting Juror 139’s willingness to follow instructions over his clear and unequivocal expression of his views on justice meaning “[a]n eye for an eye,” (App’x Vol. 5, Voir Dire Tr.- — Part 9, at 1322), does not reflect a credibility determination. See Morgan, 504 U.S. at 735, 112 S.Ct. 2222 (“It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so.”). And the majority’s contention that Juror 139 was not an automatic death penalty juror simply because he “never expressed doubts as to whether he could follow the law,” Maj. Op. at 779, is clearly incompatible with the Supreme Court’s guidance in Morgan. Because credibility is not at issue, no special deference is due to the trial court’s judgment. In this case, the panel was only called on to decide whether there was clear and convincing evidence that the trial judge erred in declining to remove Juror 139 for cause — and that evidence is manifest.
The majority is only able to reach its conclusion through its strained employment of out-of-context quotations from cases that it designates as the metes and bounds of Sixth Circuit death penalty jurisprudence. Relying on Bowling v. Parker, 344 F.3d 487, 520 (6th Cir.2003) as the linchpin comparator case of its independent analysis, the majority contrasts Juror 139’s plainly deficient explanation of his duties (conflating mitigation evidence with mental incapacity) to a strikingly similar explanation offered by the juror in Bowling who was found not to be an automatic death penalty juror. See Maj. Op. 779-80. However, the majority conveniently omits from its opinion that the juror in Bowling clarified himself immediately following the troubling statement by testifying that he would consider all of the mitigating factors, all of the possible sentences, and that he “definitely [did not] want ... [to] see someone take the death penalty.” 344 F.3d at 520. Juror 139’s views on the death penalty were in polar opposition to this expression of understanding by the juror in Bowling.
In this ease, all of the evidence indicates that Juror 139 single-mindedly favored the death penalty and that he would possibly consider a life sentence only if the defense could prove that Trimble “was under the *790 influence or something, or not quite right in the head.” (App’x Vol. 5, Voir Dire Tr. — Part 9, at 1329.) This artless statement, Juror 139’s best and final attempt to conform his views to the prevailing law, is entirely devoid of any indication that Juror 139 would consider any of Trimble’s mitigation evidence. Moreover, Juror 139’s responses make clear that the only circumstance in which he would consider a life sentence was one where Trimble, by definition, was not guilty of aggravated murder with the death penalty specifications. This plainly incorrect recitation of his duties, which stands in direct opposition to Trimble’s constitutional right to an impartial jury, squarely resolves the issue before this panel. Franklin, 434 F.3d at 426 (“[T]hat [the juror] would consider all of the evidence does not remove the fact that she also seemed to expect some of that evidence to come from [the defendant] by way of proof of his innocence.”). This case is controlled by Franklin in that Juror 139 “was biased because [he] could not understand the law rather than because [he] had a preexisting opinion about [the defendant].” Id. Much like the juror in Franklin, Juror 139 impermissibly placed a burden on the defense to prove that Trimble had the right to live. Compare (App’x Vol. 5, Voir Dire Tr. — Part 9, at 1329 (“But if he was under the influence or something, or not quite right in the head, if you can prove that, then maybe [the penalty] shouldn’t be so harsh.”) (emphasis added)), with Franklin, 434 F.3d at 424 (“If the jury would listen to both of the lawyers, you know, and whatever evidence they had to prove him not guilty, I’d sit here and listen to it.”) (emphasis added).
The majority contends that the most important thing to consider is that the trial judge thought Juror 139 had been rehabilitated simply because he offered affirmative responses when asked whether he would consider mitigation evidence and whether he would follow the court’s instructions. However, Juror 139’s affirmative responses to rote questions are an insufficient basis alone to uphold the trial court’s judgment. See Darden, 477 U.S. at 176, 106 S.Ct. 2464 (affirming that a reviewing court’s inquiry “does not end with a mechanical recitation of a single question and answer”); see also Franklin, 434 F.3d at 428 (“While we appreciate the judge’s attempts to rehabilitate this juror, he had a duty to dismiss a prospective juror who could not follow the law.”). When the testimony is viewed as a whole, it is readily apparent that Juror 139 constituted an automatic death penalty juror. There is no indication that Juror 139 could follow the law and serve as an impartial juror by considering Trimble’s mitigation evidence, other than his laconic responses affirming his purported understanding — e.g., “yeah,” “uh huh,” “right,” and “I understand that.” (App’x Vol. 5, Voir Dire Tr. — Parts 8 & 9.) On the other hand, Juror 139 was particularly forthcoming when he expressed his pro-death penalty stance in no uncertain terms:[1] “If he killed three people he should [be sentenced to death]”; “Because if you take a life why should you be allowed to live”; “An eye for an eye, all that”; “What goes around comes around”; “Yeah, I just, if you’re guilty, without a reasonable doubt, then if you take somebody’s life your life should go — you shouldn’t be allowed to live either”; “[I]f he already knew what he was doing, or' whatever, then he should get the death penalty. But if he’s like for some reason off and whatever, then maybe just prison or something like that.” (App’x Vol. 5, Voir Dire Tr. — Parts 8 & 9.) These undisputed statements demonstrate with no room for-ambiguity or serious debate that *791 the trial judge made a manifest error in judgment that cannot withstand constitutional scrutiny. The evidence is beyond clear and convincing that Juror 139 constituted an automatic death penalty juror because he expressed a pro-death penalty stance and proved incapable of recognizing his duty to consider mitigation evidence at the penalty phase of Trimble’s trial.
Seeing no rational basis for overturning the district court’s judgment granting ha-beas relief, I respectfully dissent.

. The following statements are presented in chronological order.